Robert STAUFFER, A Minor,
by his Natural Guardian,
Margo E. DeMARCO

v.

WILLIAM PENN SCHOOL DISTRICT,
David Gobel, Toby Greco, and
Robert Wetzel.

Civ. A. No. 92–1251.

United States District Court,
E.D. Pennsylvania.

May 21, 1993.

John C. Fekety, Havertown, PA, for plaintiffs.

Michael I. Levin, Cleckner and Fearen, David W. Brown, Cleckner and Fearen, Willow Grove, PA, for defendants.

## MEMORANDUM

DuBOIS, District Judge.

Presently before this Court is the Motion of defendants' William Penn School District ("School District"), David Gobel, Toby Greco and Robert Wetzel (collectively, "defendants") for Summary Judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.

Plaintiffs, Robert Stauffer ("Robert"), a 13–year old boy with a learning disability, and Margo DeMarco ("Mrs. DeMarco"), his mother, brought this action pursuant to the Education for All Handicapped Children Act, 20 U.S.C. § 1400, et seq. ("EHA") [1]; 42 U.S.C. § 1983; and applicable provisions of the Pennsylvania School Code, 24 P.S. § 13–

1. The EHA was amended and is now called the Individuals with Disabilities Education Act ("IDEA").

1371, *et seq.*, and 22 Pa.Code 13.1 *et seq.*[2], alleging that their rights were violated by defendants. Plaintiffs contend Robert was denied a free appropriate education when defendants failed to adhere to certain requirements with regard to the preparation and implementation of Robert's Individualized Educational Program ("IEP").[3]

Specifically, plaintiffs contend the IEPs dated September 26, 1989, September 24, 1990 and October 7, 1991 were inadequate because "conspicuously absent" from the IEPs were (1) techniques to help Robert overcome his handicapping condition; (2) accommodations for the subjects in which Robert participated in a regular classroom; (3) advice to Robert's parents as to how to reinforce class lessons at home and assist with homework; (4) therapy to raise Robert's self-esteem and assist him in learning how to cope with frustrations caused by his learning disability, including appropriate behavior with teachers and in the classroom; and (5) counseling for Mr. and Mrs. DeMarco so that they could continue to reinforce what Robert was learning in his individual therapy. Plaintiffs maintain they were required to incur out-of-pocket expenses for services related to Robert's disability, including tutoring and psychotherapy, which, plaintiffs say, defendants should have provided. Plaintiffs seek reimbursement for these expenses as well as compensatory damages and attorneys' fees.

Defendants have filed a Motion for Summary Judgment on several alternative theories: failure to exhaust administrative remedies, failure to state a claim upon which relief can be granted, no entitlement to compensatory damages or reimbursement for out-of-pocket expenses and qualified immunity of the individual defendants. For the reasons

that follow, the Court will grant defendants' Motion.

## I. BACKGROUND

Robert has attended school in the School District since he began kindergarten in September, 1984. Robert began experiencing difficulties in school in first grade, the 1985–1986 academic year. He had difficulties in all subjects with respect to learning, completing work and sitting still during quiet times. Because of these problems, a multi-disciplinary team ("MDT") meeting was held, and an MDT report was prepared detailing Robert's problems. Toby Greco, a School Psychologist, sent Mrs. DeMarco a Notice of Testing Form, which she signed on March 12, 1986 and returned, agreeing to the testing. The document which Mrs. DeMarco signed contained the following language:

> If you do *NOT* agree to a psychological evaluation, as outlined above, at this time, please sign here. We will contact you to arrange a personal conference as soon as possible. You also have the right to request a hearing concerning this proposed evaluation.

Mr. Greco conducted the agreed upon psychological testing of Robert on October 20, 1986, and prepared a report detailing the results of the evaluation. Mrs. DeMarco received written notice indicating that Mr. Greco would hold a conference on November 24, 1986 to discuss the psychological evaluation. At that meeting, it was suggested that Robert undergo neurological testing and Mrs. DeMarco signed a document, agreeing to the testing. This document contained language affording Mrs. DeMarco a right to a special education due process hearing ("due process hearing") if she opposed the testing.[4] There-

---

**2.** 22 Pa.Code 13.1 *et seq.* was repealed in 1990 and replaced by 22 Pa.Code 14.1 *et seq.* effective July 1, 1990.

**3.** As the Supreme Court explained in *School Comm. of Burlington v. Department of Education,* 471 U.S. 359, 368, 105 S.Ct. 1996, 2002, 85 L.Ed.2d 385 (1985), the IEP is "the modus operandi of the [IDEA]. The IEP is in brief a comprehensive statement of the educational needs of a handicapped child and the specially designed instruction and related services to be employed to meet those needs. The IEP is to be developed

jointly by a school official qualified in special education, the child's teacher, the parents or guardian, and, where appropriate the child."

**4.** Under the IDEA, complaints are reviewed at an "impartial due process hearing" conducted by the state or local education agency. § 1415(b)(2). A final decision must be reached no later than 45 days after the receipt of a due process hearing request. 34 C.F.R. § 300.-512(a)(1) (1986). If a due process hearing is conducted at the local level, an appeal may be taken to a state agency which must render a final

after, Dr. David Baker conducted a neurological examination of Robert, and the results of his examination were mailed to Mrs. DeMarco.

In December, 1986, Mrs. DeMarco was given a Notice of Recommended Assignment ("NORA") in which it was recommended that Robert be placed in Park Lane Elementary School's Learning Disability Placement Room. The NORA contained detailed notice of Mrs. DeMarco's special education due process rights, including the right to initiate the hearing process if she disagreed with the recommended course of action. The NORA referred to the applicable rules and regulations which set forth Mrs. DeMarco's due process hearing rights and explained the prehearing and due process hearing procedure. In addition, the NORA provided Mrs. DeMarco with information about different groups which might be of assistance to her, including the Delaware County Association for Children with Learning Disabilities. Mrs. DeMarco neither obtained copies of the rules and regulations nor contacted any group. (DeMarco Dep. at 53–55) Mrs. DeMarco read and understood the NORA and signed it on December 1, 1986. As a consequence of Mrs. DeMarco's approval of the NORA, an IEP was prepared for Robert.

During the 1986–87 school year, Mrs. DeMarco did not object to any of the School District's actions with respect to Robert. Indeed, on March 12, 1987, she wrote a letter to Robert Clegg, principal of Park Lane Elementary School at that time, thanking him for his time and concern. (DeMarco Dep. at 62)

Commencing in August, 1987, Mrs. DeMarco began contacting the Educational Law Center in an effort to resolve what she believed to be a transportation problem. On September 3, 1987, Mrs. DeMarco wrote a letter to Dr. T. Kerr, Assistant Superintendent of the School District, in which she expressed concern about Robert's transportation and requested a due process hearing. (DeMarco Dep. at 67–68) On September 11, 1987, Mr. David Gobel, Coordinator of Special Services for the School District, wrote Mrs. DeMarco a letter in which he responded to her concerns. This letter solved the transportation problems, obviating the need for Mrs. DeMarco to go through a due process hearing. (DeMarco Dep. at 77)

In February, 1988, while Robert was enrolled in the full-time learning disability classroom, Mr. Gobel wrote a letter to Mrs. DeMarco advising her that the School District wanted to reevaluate Robert to determine whether his current educational program was appropriate. A reevaluation report dated April 11, 1988 was prepared and sent to Mrs. DeMarco.

In March 1989, when Robert was finishing third grade at Walnut Street Elementary School, his teacher, Mrs. Engle, believed Robert had sufficiently progressed to go into regular education. Mrs. Engle sent a report to Mrs. DeMarco recommending that Robert go into a trial period in regular education. Mrs. DeMarco agreed and signed the report. In May, 1989, a NORA was prepared and

decision within 30 days. § 1415(c); 34 C.F.R. § 300.512(b)(1). An aggrieved party may appeal to federal or state court, which is empowered to grant appropriate relief. § 1415(e)(2); 34 C.F.R. § 300.511. In addition to the procedural safeguard enumerated in 20 U.S.C. § 1415, the Education Division General Administrative Regulations, 34 C.F.R. §§ 76.1–76.902 (EDGAR) sets forth an administrative mechanism for assuring that a state complies with provisions of the IDEA. *See Mrs. W. v. Tirozzi*, 832 F.2d 748, 751 (2d Cir.1987).

Under Pennsylvania law, parents of a handicapped child have the right to a due process hearing if they are dissatisfied with any component of their child's educational program. Their rights are set forth in 22 Pa.Code § 14.64. Section (a) provides:

Parents may request an impartial due process hearing concerning the identification, evaluation or educational placement of a student who is exception or who is though to be exceptions or a young child who is eligible or who is thought to be eligible, if the parents disagree with the School District's identification, evaluation or placement of the student or young child.

The term "education placement" is defined broadly in 22 Pa.Code § 14.1 as:

The overall educational environment in which special education and related services or early intervention services and programs are provided to an exceptional student or eligible young child.

sent to Mrs. DeMarco. This NORA detailed the same rights identified in the prior NORA, including the right to initiate a due process hearing. Mrs. DeMarco approved the recommended assignment with respect to this NORA. An IEP dated September 26, 1989 was prepared to which Mrs. DeMarco did not object. (DeMarco Dep. at 91–93)

In September, 1990, Robert started fifth grade at Park Lane Elementary School. An IEP dated September 24, 1990, was prepared for the 1990–91 school year, which Mrs. De-Marco signed. Mrs. DeMarco did not exercise her right to a due process hearing to contest any part of the IEP. (DeMarco Dep. at 98–98)

On January 13, 1991, Mrs. DeMarco sent a letter to Mr. Gobel requesting psychological re-testing. Mr. Gobel responded by letter dated February 12, 1991 scheduling an MDT meeting. Mrs. DeMarco stated that although she wanted a psychological reevaluation, not an MDT meeting, she did not initiate a due process hearing to voice her objections. (DeMarco Dep. at 92) Mr. Greco performed a psychological reevaluation of Robert, detailing his findings in a March 12, 1991 letter to Mrs. DeMarco. Soon after, an MDT meeting was conducted, which Mr. Greco, Mr. Robert Wetzel, principal of Park Lane Elementary School, Ms. Cheryl Wise, Robert's resource room teacher and Mrs. DeMarco attended.[5] At the meeting, Mrs. DeMarco did not raise any objections to the IEP. (DeMarco Dep. at 118) After the meeting, a report dated March 18, 1991, was prepared, which stated that the IEP prepared September 24, 1990 was still appropriate. Mrs. DeMarco neither objected nor initiated due process. (DeMarco Dep. at 118)

On March 21, 1991, Mrs. DeMarco wrote Ms. Marveta Clark, Robert's homeroom teacher, a letter in which she made several suggestions about Robert's educational program. Ms. Clark responded by a writing a letter to Mrs. DeMarco, a letter Mrs. De-Marco found unsatisfactory. (DeMarco Dep. at 126) Mrs. DeMarco did not, however, ask for a due process hearing. Instead, she wrote to Ms. Wise, expressing her dissatisfaction with Ms. Clark. (DeMarco Dep. at 126)

On April 10, 1991, Robert was evaluated by Dr. Robert Slater, a family neurologist to whom Mrs. DeMarco had been referred by her family physician. Dr. Slater prepared a report dated April 12, 1991, in which he stated there was no change in Robert's overall health; there was no significant behavior problem at school; there was no change in Robert's neurological status; his educational program was satisfactory; it was not necessary to make any changes in his educational program. On the basis of Dr. Slater's assessments, Mrs. DeMarco did not initiate a due process hearing. (DeMarco Dep. at 101; 130–32)

On April 18, 1991, Mrs. DeMarco sent another letter to Ms. Wise, stating she was frustrated with teachers who do not understand or make allowances for learning disabled children. Mrs. DeMarco was referring to Ms. Clark and Mrs. Maxwell, Robert's resource room teacher from the previous year. However, Mrs. DeMarco acknowledged that she never observed these teachers in class. (DeMarco Dep. at 141–42) In this letter, Mrs. DeMarco also questioned whether the School District could meet Robert's educations needs. She did not, however, ask for a due process hearing. (DeMarco Dep. at 144–45)

In June, 1991, Mrs. DeMarco stated in another letter to Ms. Wise, "you did not address [Robert's] behavior problems, potential or realized, on his IEP." Up until the 1991–92 school year, behavior had not been addressed on any of Robert's IEPs, but Mrs. DeMarco had not objected to the fact that the IEPs made no provision for behavior. (DeMarco Dep. at 155) In this letter, Mrs. DeMarco also referred to a "lack of cooperation." Mrs. DeMarco stated she was referring to Ms. Clark, specifically her alleged refusal to cooperate with any of the recommendations made at the March, 1991 MDT meeting, to do things Mrs. DeMarco or her husband requested, and to sit down and dis-

---

**5.** Mrs. DeMarco testified at her deposition that she thought Ms. Marveta Clark, Robert's homeroom teacher, should have been at that meeting, although she neither raised any objections to Ms. Clark's absence at the time of the meeting, nor initiated a due process hearing.

cuss Robert's problems. (DeMarco Dep. at 159)

In the summer of 1991, after the school year was completed, Mrs. DeMarco came to believe that parts of the IEP she signed on September 24, 1990, were inappropriate. (DeMarco Dep. at 99) She believed Robert should have tutoring to enhance his learning comprehension and therapy to deal with his low self-esteem and learning disabilities. She did not, however, seek a special education due process hearing to obtain tutoring or therapy. (DeMarco Dep. at 101, 103) Instead, in June, 1991, Mrs. DeMarco and her husband requested mediation with the Pennsylvania Special Education Mediation Service ("PSEMS"). Mrs. DeMarco's decision to pursue mediation instead of a due process hearing was based largely upon the recommendations of the Education Law Center, which informed her that if she could not resolve her alleged problems through mediation she had the option of initiating a due process hearing.

Mr. Greco informed Dr. Thomas Jenkins, Superintendent of the School District, of the DeMarcos' request for mediation by Memorandum dated June 13, 1991. In that Memorandum, Mr. Greco stated that he had discussed Robert's educational program with Mr. DeMarco on a number of occasions and had advised him that Robert's IEP could be revised if the DeMarcos' had a dispute regarding the special education services provided. Mrs. DeMarco denied being told by her husband that the School District had informed him that Robert's IEP could be revised. (DeMarco Dep. at 166, 169) By letter dated June 20, 1991, Mr. Gobel informed the DeMarcos that the School District would not agree to mediation. When the School District refused to mediate, PSEMS informed Mrs. DeMarco that she could initiate a due process hearing. (DeMarco Dep. at 172)

Instead of initiating a due process hearing, Mrs. DeMarco sent a letter to Richard Brown of the Pennsylvania Department of Education, in which she requested an investigation of the School District's practices and procedures. The letter contained numerous inaccuracies. For example, Mrs. DeMarco stated that she only received one notice of the NORA, when she had in fact received three. She also stated that she never received an MDT report, but had received the March, 1991 MDT report from Mr. Gobel in July, 1991. In addition, she stated she had never been given advance written notice of a scheduled IEP conference, whereas the undisputed evidence disclosed she had received such notice. (DeMarco Dep. at 193–94)

In response to Mrs. DeMarco's letter, Mr. Brown issued a Complaint Closure Report dated July 31, 1991, which stated the School District did not comply with certain regulations. Mrs. DeMarco did not contact the School District about Mr. Brown's report, and was apparently of the opinion that the recommendations contained in Mr. Brown's report were binding on the School District. (DeMarco Dep. at 197, 199) Mrs. DeMarco did not initiate a special education due process hearing upon receipt of Mr. Brown's report. (DeMarco Dep. at 180)

In early August, 1991, at Mrs. DeMarco's request and expense, Dr. Jonathan Cohen, licensed psychologist for the Lihn Center for Psychology in Havertown ("Lihn Center"), conducted extensive testing of Robert and prepared a neuropsychological report detailing his findings. Among other things, Dr. Cohen stated that Robert suffered from a neurological disfunction which prevents him from learning the way other children learn. Based largely on Dr. Cohen's recommendations, Robert began weekly psychotherapy sessions and weekly tutoring sessions. The psychotherapy sessions were intended to decrease Robert's frustration level, raise his self-esteem and improve his motor coordination. (DeMarco Dep. at 225) The tutoring was intended to provide educational support and help Robert deal with his attention deficit. (DeMarco Dep. at 225) At no time did Mrs. DeMarco ask the School District to incorporate strategies into Robert's IEP to help his self-esteem or motor coordination, or help him deal with his frustration. (DeMarco Dep. at 226–27) Nor did Mrs. DeMarco ever advise the School District that tutoring was necessary in order for the School District to provide a free appropriate public education. (DeMarco Dep. at 229)

On August 14, 1991, Mr. Gobel sent Mrs. DeMarco a letter which stated she would be asked to attend a conference and a proposed IEP would be presented. In that letter, he stated that Mrs. DeMarco would have the right to approve or disapprove the proposed IEP and could request an impartial hearing if she disapproved of the proposed program. By letter dated September 19, 1991, Mr. Greco invited the DeMarcos to attend the MDT meeting scheduled for September 23, 1991. A meeting was held on September 23, 1991, which Mr. Wetzel, Mr. Greco, Mr. Gobel, Assistant Superintendent of the School District Joanne Manning, Mrs. Marta Diane McGaughey, Robert's resource room teacher, and the DeMarcos attended. At that meeting, Mrs. DeMarco furnished the School District with a copy of Dr. Cohen's report, and advised the School District that Robert was attending the Lihn Center and receiving the tutoring and psychotherapy. She did not ask the School District to provide these services, nor seek reimbursement. (DeMarco Dep. at 214) An MDT report was prepared, which Mrs. DeMarco stated accurately described the subjects discussed at the conference. (DeMarco Dep. at 220–21)

In about September or October, 1991, Mrs. DeMarco began consulting with her attorney, John C. Fekety. He told her that the School District was required to provide and pay for Robert's tutoring and psychotherapy. Despite Mr. Fekety's advice, Mrs. DeMarco did not ask the School District to include these services on the IEP, nor seek reimbursement for the costs she had incurred. Nor did she initiate a special education due process hearing to obtain these services from the School District. (DeMarco Dep. at 180, 229–30)

By letter dated September 27, 1991, Mr. Greco notified the DeMarcos of an IEP planning conference scheduled for October 7, 1991. The conference was held on that day, and Mrs. DeMarco attended. An IEP for the 1991–92 School year was subsequently developed. Mrs. DeMarco agreed to the IEP, which the School District implemented.

Subsequent to the implementation of the IEP, Mrs. DeMarco became concerned that Robert was not going to Social Studies and Science class. John Keenan of the Lihn Center concluded mainstreaming was not effective and recommended that Robert attend resource room for all subjects. (DeMarco Dep. at 235) Accordingly, Mrs. DeMarco wrote letters to Mr. Wetzel dated November 26, 1991 and Dr. Van Langevald dated December 2, 1991, in which she requested that Robert be assigned to full-time resource room. The School District responded to her request, and after discussions among Mrs. DeMarco, Mr. Wetzel and Mrs. McGaughey, Robert was assigned to a full-time resource room and an IEP was drawn up to reflect the change, which Mrs. DeMarco signed. (DeMarco Dep. at 237–38) Mrs. DeMarco did not seek to have tutoring or psychotherapy included on the new IEP. Mrs. DeMarco did not seek any additional changes on the IEP between December, 1991, and June, 1992. (DeMarco Dep. at 238)

## II. STANDARD OF REVIEW

Summary judgment is appropriate where the moving party demonstrates an absence of any evidence to support the non-moving party's case, the non-moving party fails to come forward with such facts that a trier of fact could find in its favor, and the moving party is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256–57, 106 S.Ct. 2505, 2514–15, 91 L.Ed.2d 202 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). The court does not resolve questions of disputed facts, but simply decides whether there is a genuine issue of fact which must be resolved at trial. The facts must be viewed in the light most favorable to the non-moving party, and reasonable doubt as to the existence of a genuine issue of material fact is to be resolved against the moving party. *Id.*

Nonetheless, a party opposing a motion for summary judgment must designate specific facts showing that there is a genuine issue for trial because summary judgment is designed to go beyond the pleadings to assess whether a genuine issue of material fact exists. *Celotex*, 477 U.S. at 323–24, 106 S.Ct. at 2552–53. In order to defeat a properly supported motion for summary judgment, the plaintiff can not merely restate the allega-

tions of his complaint, nor rely on self-serving conclusions unsupported by specific facts in the record, but must point to evidence in the record which supports each essential element of his case. *Id.; Childers v. Joseph,* 842 F.2d 689, 694–95 (3d Cir.1988).

## III. DISCUSSION

Defendants advance five arguments in support of their motion for summary judgment: (1) this Court is without jurisdiction to decide this matter because of plaintiffs' failure to exhaust available administrative remedies; (2) plaintiffs fail to state a claim upon which relief can be granted; (3) plaintiffs are not entitled to an award of compensatory damages; (4) plaintiffs are not entitled to reimbursement of their tutoring and psychotherapy expenses; and (5) the individual defendants are protected by a qualified immunity.

Plaintiffs counter: (1) they should be excused from failing to exhaust administrative remedies because they fit within applicable exceptions; (2) they have stated a claim upon which relief can be granted; (3) compensatory damages are an available remedy to plaintiffs; (4) plaintiffs are entitled to reimbursement for their tutoring and psychotherapy expenses; and (5) the individual defendants should not be protected by qualified immunity.

### A. EXHAUSTION OF ADMINISTRATIVE REMEDIES

The requirement that parents exhaust their administrative remedies at the state level before filing suit under the IDEA or 42 U.S.C. § 1983 is set forth in section 1415(f) of the IDEA, which provides in relevant part:

> ... before the filing of a civil action under such laws seeking relief that it is also available under this subchapter, the procedures under subsection (b)(2) and (c) shall be exhausted to the same extent as would be required had the action been brought under this subchapter.

20 U.S.C. § 1415(f).

Courts interpreting this statute have uniformly held that parents are precluded from seeking relief in state or federal court under the IDEA or section 1983 until they have exhausted their administrative remedies. *See, e.g., Crocker v. Tennessee Secondary Sch. Athletic Ass'n,* 873 F.2d 933, 935 (6th Cir.1989) ("[e]very court that has considered the question has read the [IDEA's] statutory scheme as a requirement for the exhaustion of administrative remedies"); *Mrs. W. v. Tirozzi,* 832 F.2d 748, 756 (2d Cir.1987) (same); *Waterman v. Marquette–Alger Intermediate Sch. Dist.,* 739 F.Supp. 361 (W.D.Mich.1990) ("no doubt exists that [IDEA] plaintiffs must exhaust their adequate and available state and local administrative remedies before seeking relief in state or federal court ... accordingly, none of plaintiffs' claims may go forward in this court unless they have exhausted the [IDEA] administrative process").

The Sixth Circuit in *Crocker* explained the policy behind the exhaustion rule:

> To allow parents to come directly to federal courts will rend the entire scheme of [the IDEA] nugatory ... States are given the power to place themselves in compliance with the law, and the incentive to develop a regular system for fairly resolving conflicts under the Act. Federal courts, which are generalists with no expertise in the educational needs of handicapped students, are given the benefit of expert fact finding by a state agency devoted to this very purpose. Such a mechanism is necessary to give effect to a fundamental policy underlying the [IDEA]: that the needs of handicapped children are best accommodated by having the parents and the local educational agency work together to formulate an IEP for each handicapped child's education ...

873 F.2d at 935.

Parents need not, however, exhaust their administrative remedies if they meet an exception to the exhaustion requirement. There are two principal exceptions: (1) lack of notice and (2) futility or inadequacy of administrative remedies. Under the first exception, lack of notice, parents are not required to exhaust administrative procedures if they were not notified by their school district of their administrative rights. As explained by the Tenth Circuit in *Cain v. Yukon Pub. Sch. Dist.,* 775 F.2d 15, 18 (10th Cir.1985):

Schools have the affirmative responsibility of informing parents of their procedural rights under the [IDEA]; parents may not complain of earlier ignorance of rights where failure to pursue a due process hearing was more strategic in nature and not due to lack of knowledge of procedural rights.

Thus, in *Doe v. Maher,* 793 F.2d 1470 (9th Cir.1986), *modified by Honig v. Doe,* 484 U.S. 305, 327, 108 S.Ct. 592, 606, 98 L.Ed.2d 686 (1988) and *Ruth Anne M. v. Alvin Indep. Sch. Dist.,* 532 F.Supp. 460 (S.D.Tex.1982), for example, plaintiffs' failure to exhaust state remedies was not a bar to those actions because the school districts failed to give parents proper notice of their procedural rights. In *Maher,* the school district completely failed to perform its statutory duty to notify the child's grandparents of the change in the child's education program and all available safeguards and avenues of review. 793 F.2d at 1491. Similarly, in *Alvin Indep. Sch. Dist.,* because the school district did not notify the parents of their administrative rights, the parents did not know of the availability of their administrative remedies. 532 F.Supp. at 463.

■ Under the second exception, futility or inadequacy of administrative remedies, parents are not required to exhaust the administrative process where resort to this process would be futile or the available administrative remedies would be inadequate. *See, e.g., Honig v. Doe,* 484 U.S. 305, 327, 108 S.Ct. 592, 606, 98 L.Ed.2d 686 (1988) ("parents may by-pass the administrative process where exhaustion would be futile or inadequate"); *Frutiger v. Hamilton Cent. Sch. Dist.,* 928 F.2d 68, 74 (2d Cir.1991) (same). To satisfy this exception, plaintiffs must produce evidence that the School District deliberately interfered with the procedural safeguards of IDEA, or that the administrative agency would be unresponsive to the parents, or that the administrative process is incapable of granting the relief requested. *See Christopher W. v. Portsmouth Sch. Comm.,* 877 F.2d 1089, 1096 (1st Cir.1989). Exhaustion of administrative remedies is not futile simply because it may be time consuming.

*Howell v. Waterford Pub. Sch.,* 731 F.Supp. 1314, 1316 (E.D.Mich.1990).

Thus, in *Kerr Center Parents Ass'n v. Charles,* 897 F.2d 1463 (9th Cir.1990) and *Quackenbush v. Johnson City Sch. Dist.,* 716 F.2d 141 (2d Cir.1983), *cert. denied,* 465 U.S. 1071, 104 S.Ct. 1426, 79 L.Ed.2d 750 (1983), for example, failure to exhaust administrative remedies was not a bar to the actions because resort to the administrative process would have been futile. In *Kerr,* parents of handicapped children instituted a federal suit against the school district and individual administrators. Prior to bringing suit, the parents had requested a due process hearing, which the school district refused, stating that it would no longer provide educational services because the state had not appropriated sufficient funds. The Ninth Circuit held plaintiffs were not required to exhaust their administrative remedies because they had already taken all the measures to secure administrative relief which could reasonably be expected of them and the state had determined that it would not provide the funds necessary for plaintiffs' free appropriate education. 897 F.2d at 1470. Similarly, in *Quackenbush,* the Second Circuit held parents did not have to resort to administrative remedies because, given the school district's deliberate interference with the procedural safeguards afforded parents, exhaustion of administrative remedies would have been futile. 716 F.2d at 147.

■ In the instant case, plaintiffs failed to exhaust their administrative remedies before initiating this action. Indeed, the record is replete with examples of where Mrs. DeMarco failed to pursue administrative relief. In December, 1990, for example, three months after Mrs. DeMarco approved Robert's IEP for the 1990–91 school year, she became dissatisfied with Robert's program because he was failing Social Studies and Science. Mrs. DeMarco believed that Robert's regular classroom education required modifications and his special education should have included both tutoring and therapy. Yet, during the entire 1990–91 school year, Mrs. DeMarco neither asked the School District to change the IEP nor elected to pursue her right to a due process hearing to contest the

IEP in order to modify the regular classroom education or obtain tutoring and therapy. (DeMarco Dep. at 95–98, 100, 103)

Similarly in January, 1991, Mrs. DeMarco sent a letter to Mr. Gobel requesting psychological re-testing of Robert. When, in February, 1991, Mr. Gobel responded by sending a letter to Mrs. DeMarco indicating an MDT was scheduled, Mrs. DeMarco was not satisfied because she wanted a psychological re-evaluation, not an MDT meeting. However, Mrs. DeMarco elected not to request a due process hearing. (DeMarco Dep. at 109–110)

In March, 1991, Mrs. DeMarco, again dissatisfied with Robert's educations program, sent a letter to Ms. Clark, who responded by letter. Although Mrs. DeMarco was displeased with Ms. Clark's letter, feeling frustrated and "stonewalled" by her, Mrs. DeMarco chose not to ask for a due process hearing. (DeMarco Dep. at 120–30) In April, 1991, when Mrs. DeMarco again expressed dissatisfaction with Robert's educational program in a letter to Ms. Wise, Mrs. DeMarco did not initiate a due process hearing. (DeMarco Dep. at 140–45)

In June, 1991, Mrs. DeMarco again wrote to Ms. Wise, complaining that Robert's IEP did not make any provisions with regard to his behavior. Yet, Mrs. DeMarco had never previously objected to an IEP's failure to address Robert's behavior, never discussed this with the School District, and never initiated a due process hearing in order to seek provisions for Robert's behavior on the IEP. (DeMarco Dep. at 153–56)

In June, 1991, Mrs. DeMarco requested mediation with PSEMS because she wanted to resolve complaints about the educational program the School District was providing Robert. Although both the PSEMS and the Educational Law Center informed Mrs. De-Marco that she had the right to initiate a due process hearing, she elected not to pursue this avenue. (DeMarco Dep. at 167–74)

In July, 1991, Mrs. DeMarco wrote a letter to Mr. Brown of the Pennsylvania Department of Education, who responded, in August, 1991, by sending a letter listing the regulations the School District allegedly violated. Although Mrs. DeMarco believed the School District failed to comply with the recommendations contained in Mr. Brown's letter, she did not initiate a due process hearing. (DeMarco Dep. at 174–80)

In August, 1991, Robert began receiving tutoring and therapy at Mrs. DeMarco's expense. Despite Mrs. DeMarco's belief that Robert's IEP should have provided for these services, she never requested a due process hearing to seek their inclusion. (DeMarco Dep. at 189)

Mrs. DeMarco, moreover, admitted at her deposition that she failed to initiate a special education due process hearing when she was dissatisfied with a component of Robert's educational program, despite knowing of the availability of the process. (*See* DeMarco Dep. at 95–98, 100, 103, 109–110, 120–30, 140–45, 153–61, 167–74, 174–80, 189) Only once, in September, 1987, did Mrs. DeMarco request a due process hearing to resolve Robert's transportation problems, which became moot when the School District responded to her concerns. (*See* Greco Affidavit at ¶¶ 6, 7)

Plaintiffs contend they should be excused from their failure to exhaust administrative remedies because of the futility of the effort and/or the inadequacy of administrative remedies. Specifically, plaintiffs maintain "the series of events from January, 1991, through September, 1991, reflect a pattern of behavior that supports Mrs. DeMarco's belief that the administrative remedies would have been futile." (Plaintiffs' Brief in Opposition to Defendants' Motion for Summary Judgment at 4–5) In support of this position, plaintiffs point to the following: (1) Mr. Greco did not repeat any tests previously given to Robert despite Mrs. DeMarco's request in January, 1991; (2) no one from the School District told Mrs. DeMarco that her request for reevaluation was denied; (3) no one from the School District informed her that she could request a due process hearing because the School District refused to reevaluate Robert; (4) the School District refused to enter into mediation, originally attempting to have Mrs. De-Marco withdraw the request, and offering as an excuse the fact that individuals who would be required for the mediation process would not be available during the summer recess;

and (5) the School District ignored the recommendations contained in Mr. Brown's report, and treated the report with a "cavalier attitude." All this, plaintiffs argue, demonstrates the School District's "*de facto* policy of ignoring their obligation to perform certain functions." (Plaintiffs' Brief at 7) Plaintiffs finally contend that they should be excused from exhausting administrative remedies because the administrative process does not have the power to grant compensatory education. The tutoring Robert received, plaintiffs' argue, has supplemented the program provided at his school, and, therefore, should be viewed as compensatory in nature. (Plaintiffs' Brief at 8)

Plaintiffs provide *no* evidence in support of their position that they should be excusing from their failure to exhaust administrative remedies because of the futility of the effort and/or the inadequacy of administrative remedies, relying instead on the unsupported allegations set forth in their pleadings. Plaintiffs, for example, cite no evidence in support of their contention that Mr. Greco did not reevaluate Robert in January, 1991, and that no one told Mrs. DeMarco that her request for reevaluation was denied. Indeed, as Mrs. DeMarco admitted at her deposition, Mr. Greco performed an evaluation and provided Mrs. DeMarco with the results. (DeMarco Dep. at 111) Similarly, plaintiffs offer no evidence in support of their allegation that the School District's refusal to go into mediation because of the summer recess was pretextual. Rather, this allegation is based solely on the pleadings and Mrs. DeMarco's unsupported assertion at her deposition that "it was my understanding the [the School District did not want to go to mediation] because it was the end of the school year and people were not available in the summer time for those kinds of things." (DeMarco Dep. at 70) Again, plaintiffs cite no evidence in support of their contention that the School District ignored the recommendations contained in Mr. Brown's report or treated it with a "cavalier" attitude. Plaintiffs instead merely rely on their pleadings.

Plaintiffs emphasize they made requests for a reevaluation of Robert and voluntary mediation, and contacted the Pennsylvania Department of Education which issued a report addressing Mrs. DeMarco's concerns. These efforts, however, were not requests for a due process hearing. Simply put, plaintiffs have not provided *any* evidence to support their claim that exercising their due process rights would have been futile because the School District deliberately interfered with the administrative scheme or would have denied plaintiffs' request for a due process hearing. To the contrary, the evidence discloses that the School District was responsive to all of Mrs. DeMarco's requests. *See Christopher W.*, 877 F.2d at 1096 (where school district did not refuse to hold a due process hearing and did not maliciously or deliberately interfere with [IDEA's] procedural safeguard, plaintiffs failed to satisfy the futility exception).

Plaintiffs argument that available administrative remedies are inadequate is, similarly, unavailing. In support of this contention, plaintiffs cite *Lester H. v. Gilhool*, 916 F.2d 865 (3d Cir.1990), where the Third Circuit held that a retarded child, whose right to a free appropriate education had been compromised, was entitled to appropriate education services for two and a half years beyond age 21 as "compensation" for the period during which he was denied appropriate services. The Third Circuit held that resort to the administrative process would have been futile because the issues involved were purely legal, that is whether the plaintiff was entitled to 30 months of compensatory education beyond age 21 to offset "that period of deprivation of plaintiff's entitlement before age 21," and the "administrative process was powerless to address the issue of whether compensatory education was appropriate." *Id.* at 869. Notably, there were no factual issues involved in *Lester H.* because all parties "agree[d] that the in-home IEP was inappropriate and that the School District took approximately 2½ years to locate an appropriate program ... Thus, the factual question of injury, usually determined at the administrative level, was conceded in this case...." *Id.* at 870. In the instant case, by contrast, the question of injury is in dispute. Plaintiffs must establish that the School District failed to provide Robert with a free appropriate education.

By failing to exhaust their administrative remedies, plaintiffs did not afford the appropriate state agency the opportunity to render expert fact finding. The pronouncements made by the court in *Crocker*, 873 F.2d at 935, bear repeating: "To allow parents to come directly to federal courts will render the entire scheme of [IDEA] nugatory. Federal courts, which are generalists with no expertise in the educational needs of handicapped students, are given the benefit of expert fact finding by a state agency devoted to this very purpose."

In sum, because, in the instant case, resort to the administrative process would not be futile and the available administrative remedies would not be inadequate, plaintiffs do not satisfy either exception to the requirement that they exhaust administrative remedies. Accordingly, the Court will grant summary judgment in favor of defendants.

Because the Court has concluded that plaintiffs have failed to exhaust administrative remedies, and that summary judgment is warranted for this reason, the Court need not consider the other arguments advanced by defendants in support of their Motion for Summary Judgment.