Robert A. HERBERT, M.D., Plaintiff,

v.

NEWTON MEMORIAL HOSPITAL, Stephen Landauer, M.D., Donald DeLong, M.D., Ada Villafania, M.D., Dennis Collette, Defendants.

Civ. No. 95–693 (WGB).

United States District Court,
D. New Jersey.

July 29, 1996.

Everett I. Smith by Howard A. Miller, Hackensack, NJ, for Plaintiff, Robert A. Herbert, M.D.

Brach, Eichler, Rosenberg, Silver, Bernstein, Hammer & Gladstone by Joseph M. Gorrell, Richard B. Robins, Roseland, NJ, for Defendants Stephen Landauer, M.D., Donald DeLong, M.D., and Ada Villafania, M.D.

Genova, Burns, Trimboli & Vernoia by Francis J. Vernoia, Livingston, NJ, for Defendants Dennis Collette and Newton Memorial Hospital.

BASSLER, District Judge:

Defendants Newton Memorial Hospital (the "Hospital"), Stephen Landauer, M.D.,[1] Donald DeLong, M.D., Ada Villafania, M.D. (collectively, the "Defendant Doctors") and Dennis Collette ("Collette") move for summary judgment pursuant to Federal Rule of Civil Procedure 56(c). This Court's jurisdiction is pursuant to 28 U.S.C. § 1332(a) (diversity of citizenship). For the reasons set forth below, the Court grants Defendants' motion and **dismisses** the Complaint **with prejudice.**

## I. BACKGROUND

Plaintiff, Dr. Robert Herbert ("Dr. Herbert"), is a medical doctor who practices anesthesiology. (Complaint ¶ 2). In 1987, Dr. Herbert was granted staff privileges in anesthesiology at the Hospital. The Defendant Doctors also held staff privileges at the Hospital during the time period pertinent to this lawsuit. (Id. ¶¶ 4–6). At all relevant times, Collette was the President and Chief Executive Officer of the Hospital. (Id. ¶ 7).

The parties' dispute involves a contract, entitled the Professional Practice Asset Purchase Agreement (the "Agreement"), between Dr. Herbert and Dr. Donald W. Milne ("Dr. Milne") by which Dr. Milne agreed to buy certain assets of Dr. Herbert's practice. (See Professional Practice Asset Purchase Agreement, Plaintiff's Opposition Brief E1–23). Dr. Herbert alleges that the Defendant Doctors and Collette tortiously interfered with the Agreement by refusing to entertain Dr. Milne's application for staff privileges.

Dr. Herbert first considered selling his medical practice in January 1994. (Dr. Herbert Dep. 48:13–15). Accordingly, in early 1994, Dr. Herbert contacted Dr. Madeline Cosman ("Dr. Cosman"), a medical practice broker. (Id.).

It was not until June 1994, however, that Dr. Herbert was certain he wanted to sell his practice and relocate to California.[2] (Id. 48:2–5). Dr. Cosman evaluated Dr. Herbert's practice and placed advertisements in medical journals requesting inquiries from potential purchasers. (Dr. Herbert Dep. 48:12—49:9).

In connection with Dr. Cosman's evaluation of Dr. Herbert's practice, Dr. Herbert completed a "Preliminary Practice Analysis," in which Dr. Herbert was asked to share his impressions of his practice. (See Francis J. Vernoia Aff. Ex. 22). Dr. Herbert indicated that he "work[ed] at the Hospital only," that "all anesthesia machines + equip[ment] [were] owned by [the] hospital," that "mostly all" of his patients were new patients, that he did not treat any patients in his own office, that he practiced in a "loose association with 3 others," that the majority of patients are "randomly given" to him, and that he had a patient list with 4,000 to 5,000 names on it. (Vernoia Aff. Ex. 22 at 1–3).

Dr. Donald Milne ("Dr. Milne") was one of the approximately 150 doctors who inquired regarding the sale of Dr. Herbert's practice. (Cosman Dep. 115:11—115:16). On July 1, 1994, Drs. Milne and Herbert entered into the Agreement, whereby Dr. Milne agreed to purchase certain of Dr. Herbert's assets. (Vernoia Aff. Ex. 15). The Agreement listed the sale assets as follows:

a. a practitioner referral list;

b. goodwill;

c. billing records;

d. a covenant not to compete;

e. rights to telephone numbers.

(Agreement ¶ 1).

The Agreement also specifically excluded certain assets from the sale. These were:

a. Dr. Herbert's personal cash;

b. accounts receivable;

c. Dr. Herbert's diplomas and personal memorabilia;

---

1. Dr. Landauer served as the Chief of the Department of Anesthesiology from May 1992 to May 1994 and since May 1994 to the present has been the Chief of the Medical Staff at Newton. (Dr. Stephen Landauer Dep. 22:2–4).

2. Dr. Herbert wanted to move to California to join his wife, who was in the midst of a high-risk pregnancy at the time. (Dr. Herbert Dep. 48:7–11). During the one-year period preceding his decision to relocate permanently to California, Dr. Herbert worked at the Hospital two weeks per month, spending the other two weeks with his wife in California. (Dr. Herbert Dep. 36:18—37:10).

d. the assets of Dr. Herbert's welfare and benefit plans; and

e. Dr. Herbert's automobiles.

(Agreement ¶ 3).

The Agreement provided for a maximum sale price of $400,000. (Agreement ¶ 4(A)). $200,000 of this sum was contingent upon Dr. Milne generating $300,000 or more in billings in each of the two years after Dr. Milne's starting date. (*Id.* ¶ 4(B)). The purchase price was allocated, as follows:

| | |
|---|---|
| Goodwill: | $100,000 |
| Referral List: | $ 50,000 |
| Consultation Agreement: | $100,000 |
| Covenant Not To Compete: | $150,000 |

(Agreement ¶ 5). Dr. Herbert's contractual consultation duties consisted of introducing Dr. Milne to colleagues at the Hospital, training Dr. Milne in billing techniques, teaching Dr. Milne the local mores of the call and coverage schedule at the Hospital and generally using his best efforts to secure a transition of the practice to Dr. Milne. (Agreement ¶ 7(B)).

The Agreement provided that it would be null and void if Dr. Milne failed to get temporary hospital privileges to practice anesthesia at Newton Memorial Hospital in Newton, New Jersey. (Agreement ¶ 24).

Dr. Herbert did not inform anyone at the Hospital of his intention to relocate or sell his practice until July 7, 1994. On that day, he entered the Hospital's operating room area and said to Dr. Landauer, "I've decided that I'm going to be leaving. This is Dr. Milne. I've sold him my practice. He's going to take over for me." (Dr. Herbert Dep. 84:16–25). According to Dr. Herbert, Dr. Landauer became enraged and demanded to know if Dr. Herbert had sold his practice for money. (Dr. Herbert Dep. 85:9–21).

On July 7, 1994, Dr. Herbert also told Dr. Villafania of his decision to relocate. According to Dr. Herbert, Dr. Villafania was upset over the news of Dr. Herbert's departure, particularly as it might affect her plans to vacation in December. (Dr. Herbert Dep. 92:4–12). Dr. Landauer, according to Dr. Milne, made it "quite clear" that if Dr. Milne had a contract with Dr. Herbert, he would not receive a position on the Hospital. (Dr. Milne Dep. 29:10—30:9); (Dr. Landauer Dep.

55:15–22 ("I did not want to have a contractual relationship, I did not want to have any binding relationship between Dr. Milne and Dr. Herbert and the reason for that was, there were enough reasons that I did not trust what Dr. Herbert might be doing, especially given the events of that day which changed rather dramatically and rather suddenly and therefore if he did have a relationship with Dr. Herbert I would like to know what it was so that we as a department could ascertain what if anything might be the impact of Dr. Herbert in the future.")).

On the evening of July 7, 1994, Dr. DeLong and his wife took Dr. Milne out to dinner. According to Dr. Milne, he was asked questions throughout the evening as to whether he and Dr. Herbert had a contract to purchase Dr. Herbert's practice. (Dr. Milne Dep. 34:2–8).

On July 8, 1994, Dr. Herbert met with Dr. Landauer. According to Dr. Herbert, Dr. Landauer told him that "[i]f [Dr. Milne] pays money to you and if you don't resign, [Dr. Milne] will not get on staff." (Herbert Dep. 117:21–22).

In or around July 8, 1994, Dr. Herbert also informed Dr. Landauer that he would not resign from the Hospital, but rather would apply for a leave of absence. (*Id.*).

By letter dated July 12, 1994, Dr. Herbert formally applied for a leave of absence from the Hospital. Dr. Herbert stated the reason for his application: "The reason for this leave of absence is the fact that my wife is undergoing a complicated pregnancy and she is alone without family or close friends in California." (Letter, dated July 12, 1994, from Dr. Herbert to Stephen Landauer, M.D., Plaintiff's Opposition Brief at E–24); *see also* Dr. Herbert Dep. at 82:18—83:1 ("I had planned to move to California with my wife assuming everything was working out well with the baby. If there had been a problem with the baby, I didn't know what was going to happen. I didn't know if she was going to have—what her state of mind would be. Q: You wanted to leave your options open so you could return? A: Correct.").

Dr. Herbert was granted a leave of absence on July 18, 1994. (*See* Medical Execu-

tive Committee Notes, dated July 18, 1994, Plaintiff's Opposition Brief at E–26 ("Robert A. Herbert, M.D., requested a nine (9) month leave of absence to be with his wife who lives in California. There was some discussion about the circumstances surrounding his departure. The Committee agreed that the leave of absence should be effective July 19, 1994. This does not need to go to the Board Executive Committee for ratification. Dr. Landauer noted that a locum tenens [3] Anesthesiologist is being sought.")). During his leave of absence, the Hospital was obligated to allow Dr. Herbert to resume his position on the Hospital staff if he chose to return. (*See* Medical and Affiliate Staff By–Laws, Article III, Section 8; Plaintiff's Opposition Brief at E–59).

Over the weekend of July 9 to 10, 1994, Dr. Landauer discussed staffing decisions with Drs. DeLong and Villafania. The Defendant Doctors agreed that they could not recommend granting temporary staff privileges while Dr. Herbert was on a leave of absence. (Landauer Dep. 62:22–25 ("I'm saying that we did not need manpower while we had four members of the anesthesia department.")).[4]

Dr. Milne told Dr. Landauer that he was "willing to come on as staff of the Hospital in a role similar to what the rest of them [*i.e.,* Dr. Herbert and the Defendant Doctors] had within the Department," and not as a "local tenant [*i.e.,* a temporary replacement]." (Dr. Milne Dep. 29:17–21).

Dr. Milne submitted a formal application for staff privileges on July 14, 1994. (Letter from Dr. Donald Milne to Mr. Dennis Collette, dated July 14, 1994; Vernoia Aff. Ex. 28). On July 20, 1994, the Hospital's Department of Anesthesiology Credentials Committee met and discussed staffing the department. At the time, a pending state regulation would have required that each hospital have a "pediatric anesthesiologist" on staff. (Joseph M. Gorrell Aff. Ex. V). The minutes of the meeting contained the following recommendation to the Hospital's President regarding the Department's staffing needs:

1. If possible, we should wait until we hear from State about pediatric anesthesiologist regulation before we consider others.

2. Until we see how the effects of [Dr. Herbert's] leave of absence affects service, the department feels we can temporize. It would create disharmony to have too large a staff and decrease the ability to keep our skills finely tuned. A decrease in cases per person would decrease the skill level.

(Department of Anesthesiology Credentials Committee Minutes dated July 20, 1994; Plaintiff's Opposition Brief at E–30).

Dr. Milne was not certified in pediatric anesthesiology. By letter dated July 25, 1994, Collette advised Dr. Milne that his application for staff privileges would not be considered. The letter stated in part:

Thank you for your letter and application which I received July 19, 1994. As we discussed during our telephone conversation on July 20, Dr. Robert Herbert has been granted a leave of absence by the Medical Staff for the next nine months. Therefore, your application cannot be considered at this time.

By letter dated August 1, 1994, Dr. Milne wrote to Dr. Landauer reiterating his request for privileges at the Hospital. (Letter from Dr. Milne to Dr. Landauer dated August 1, 1994; Vernoia Aff. Ex. 27). In response to the Hospital's concerns regarding potential overstaffing, Dr. Milne pointed out that "Dr. Herbert has a restrictive covenant with me whereby he will not work at Newton as long as I do." (*Id.*).

---

**3.** **Locum tenens:** Holding the place, a deputy, substitute, lieutenant or representative. *Black's Law Dictionary* (6th ed. 1990) at 941.

**4.** Staff limitations are necessary, according to Dr. Landauer, to maintain the skill level of each doctor on the staff. *See* Landauer Dep. 95:10–17 ("The recommendations are that doctors perform a minimum number of cases per year. That was one of the arguments for why you keep a limited number of physicians, ... so that they can maintain their skills."); *see also* Department of An-

esthesiology Credentials Committee Meeting Minutes, dated July 20, 1994, Plaintiff's Opposition Brief at E–30 ("Recommendation to Mr. Collette: Until we see how the effects of [Dr. Herbert's] leave of absence affects service, the department feels we can temporize. It would create disharmony to have too large a staff and decrease the ability to keep our skills finely tuned. A decrease in cases per person would decrease the skill level.").

Collette responded to Dr. Milne on August 10, 1994. (Vernoia Aff. Ex. 6). Collette reiterated that the Anesthesiology Department did not require another full-time physician and that "any agreement you [Dr. Milne] may have with Dr. Herbert is not relevant to these considerations." (*Id.*).[5]

Dr. Herbert sent an official letter of resignation to the Hospital in January 1995. (Dr. Herbert Dep. 83–84). During Dr. Herbert's leave of absence, the Hospital did not grant staff privileges to any new anesthesiologists, nor consider their applications. The Hospital received over 25 applications for anesthesiology staff privileges during this time period. (Gorrell Aff. Ex. T). It was only after Dr. Herbert officially resigned from the Hospital's staff that a new anesthesiologist was granted temporary staff privileges.[6]

Dr. Herbert's Complaint contains two counts. Count I alleges that the Defendant Doctors and Collette tortiously interfered with Dr. Herbert's prospective economic advantage by refusing to entertain the application of Dr. Milne, with whom Dr. Herbert had a contractual relationship, for staff privileges at the Hospital. Count II seeks to hold the Hospital liable under an unidentified theory of imputation.

## II. *DISCUSSION*

### A. *The Summary Judgment Standard*

Summary judgment is appropriate only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Whether a fact is material is determined by the applicable substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). A fact is material if it might affect the outcome of the case. *In re Headquarters Dodge, Inc.*, 13 F.3d 674 (3d Cir.1993). An issue involving a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Healy v. New York Life Ins. Co.*, 860 F.2d 1209, 1219 n. 3 (3d Cir.1988), *cert. denied*, 490 U.S. 1098, 109 S.Ct. 2449, 104 L.Ed.2d 1004 (1989). In essence, the inquiry is whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law. *Anderson*, 477 U.S. at 251–52, 106 S.Ct. at 2511–12.

The moving party has the initial burden of showing that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). Where the moving party satisfies this requirement, the burden shifts to the nonmoving party to present evidence that there is a genuine issue for trial. *Id.* at 324, 106 S.Ct. at 2553. Once the moving party has carried its burden of establishing the absence of genuine issues of material fact, the nonmoving party "may not rest upon mere allegations or denials" of its pleading, Federal Rule of Civil Procedure 56(e), but must produce sufficient evidence to reasonably support a jury verdict in its favor, *Anderson*, 477 U.S. at 249, 106 S.Ct. at 2510–11, and not just "some metaphysical doubt as to material facts." *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

In determining whether any genuine issues of material fact exist, the Court must resolve "all inferences, doubts, and issues of credibility ... against the moving party." *Meyer v. Riegel Products Corp.*, 720 F.2d 303, 307 n. 2 (3d Cir.1983), *cert. dism'd*, 465

---

5. While Collette, the Hospital's President, indicated that the Agreement was not relevant to the Hospital's decision, Dr. Landauer indicated his concern over the Agreement in his diary written contemporaneously with the events of this lawsuit. *See* Landauer Dep. 45:4–18 ("I asked Dr. Herbert if there was money or a contract involved and he said Dr. Milne would give him $10,000 as his quote practice, unquote, had been valued, quote, at $100,000 to $300,000. I never received a satisfactory reason for this value. I said I'd prefer to have a partner—I used partner meaning an associate—in the future who was not associated with any financial transaction, just as we always had done. Dr. Herbert said it was none of my business.").

6. Dr. Milne had already received temporary staff privileges at another hospital, and therefore was not considered by Newton for temporary staff privileges after Dr. Herbert officially resigned. (Milne Dep. 105:19–25).

U.S. 1091, 104 S.Ct. 2144, 79 L.Ed.2d 910 (1984) (*citing Smith v. Pittsburgh Gage & Supply Co.*, 464 F.2d 870, 874 (3d Cir.1972)).

■■■■ Since a motion for summary judgment is designed to go beyond the pleadings, factual specificity is required of a party who opposes such a motion. *Celotex*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). Accordingly, in order to defeat a properly supported motion for summary judgment, a party may not merely restate the allegations of his complaint. *Farmer v. Carlson*, 685 F.Supp. 1335, 1339 (M.D.Pa.1988). Moreover, a party cannot rely upon self-serving conclusions, unsupported by specific facts in the record. *Celotex*, 477 U.S. at 322–23, 106 S.Ct. at 2552–53. A non-moving party must point to concrete evidence in the record which supports each essential element of his case. *Id.* If the party fails to provide such evidence, then he is not entitled to a trial and the moving-party is entitled to summary judgment as a matter of law. Fed.R.Civ.P. 56(e).

■■■■ In deciding a summary judgment motion, however, the Court's role is not "to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2511. If the party opposing summary judgment has exceeded the "mere scintilla" threshold and has offered a genuine issue of material fact, then the Court cannot credit the movant's version of events, even if the quantity of the movant's evidence far outweighs that of its opponent. *Big Apple BMW v. BMW of North America*, 974 F.2d 1358, 1363 (3d Cir.1992), *cert. denied*, 507 U.S. 912, 113 S.Ct. 1262, 122 L.Ed.2d 659 (1993).

■■■■ When a case turns on credibility determinations, summary judgment is inappropriate. *Coolspring Stone Supply, Inc. v. American States Life Ins. Co.*, 10 F.3d 144, 148 (3d Cir.1993). Furthermore, "[i]ssues of knowledge and intent are particularly inap-

propriate for resolution by summary judgment, since such issues must often be resolved on the basis of inferences drawn from the conduct of the parties." *Id.* (quoting *Riehl v. Travelers Ins. Co.*, 772 F.2d 19, 23 (3d Cir.1985)).

**B.** *Dr. Herbert's Claim for Tortious Interference*

**1.** *Elements of a Tortious Interference Claim Under New Jersey Law*

■■■■ The five elements of a tortious interference claim are: (1) a plaintiff's existing or reasonable expectation of economic benefit or advantage; (2) the defendant's knowledge of that expectancy; (3) the defendant's wrongful, intentional interference with that expectancy; (4) the reasonable probability that the plaintiff would have received the anticipated economic benefit in the absence of the interference; and (5) damages resulting from the defendant's interference. *Federal Deposit Insurance Corp. v. Bathgate*, 27 F.3d 850, 871–72 (3d Cir.1994); *Lightning Lube v. Witco*, 4 F.3d 1153, 1167 (3d Cir.1993); *Printing Mart–Morristown v. Sharp Electronics*, 116 N.J. 739, 751, 563 A.2d 31 (1989)[7].

■■■■ A plaintiff seeking to recover under New Jersey law for tortious interference must show that the defendant specifically intended to harm the plaintiff. *Lightning Lube*, 4 F.3d at 1170.

■■■■ In order to prevail on a claim for tortious interference with a prospective economic advantage, the plaintiff must prove that the defendant acted with malice. *Sgro v. Getty Petroleum Corp.*, 854 F.Supp. 1164 (D.N.J.1994); *Ideal Dairy Farms, Inc. v. Farmland Dairy Farms, Inc.*, 282 N.J.Super. 140, 659 A.2d 904 (App.Div.1995).

■■■■ Malice, in the context of a tortious interference claim, is not used in its literal sense to mean defendants' ill will or spite toward the plaintiff, but rather it means an intentional doing of a wrongful act without

---

**7.** The Third Circuit has recently set forth a somewhat different statement of the elements of a tortious interference claim. *See Cooper Distributing Co. v. Amana Refrigeration, Inc.*, 63 F.3d 262, 281 (3d Cir.1995) ("Under New Jersey law, the elements of a claim for tortious interference are as follows: (1) a prospective economic relationship from which the plaintiff has a reasonable expectation of gain; (2) intentional and unjustifiable interference with that expectation; and (3) a causative relationship between the interference and the loss of the prospective gain.").

justification or excuse. *Sgro,* 854 F.Supp. at 1183; *Labus v. Navistar Intern. Transp. Corp.,* 740 F.Supp. 1053, 1063 (D.N.J.1990).

■ A "wrongful act" means "any act which will, in the ordinary course, infringe upon the rights of another to his damage, except and unless it be done in the exercise of an equal or superior right." *Id.; Association Group Life, Inc. v. Catholic War Veterans,* 120 N.J.Super. 85, 98, 293 A.2d 408 (App.Div.1971) ("Tort liability for interference with prospective economic benefit arises when the conduct of the defendant is not in the reasonable exercise of an equal or superior right").

■ While the wrongful act need not be illegal *per se* to establish tort liability, *Lightning Lube,* 4 F.3d at 1167, it nevertheless must be "transgressive of generally accepted standards of common morality or law." *Association Group Life, Inc. v. Catholic War Veterans,* 120 N.J.Super. 85, 293 A.2d 408, 415 (App.Div.1971); *Inventive Music Ltd. v. Cohen,* 617 F.2d 29, 34 (3d Cir.1980); *Labus,* 740 F.Supp. at 1063 ("The interference alleged must be both intentional and legally or ethically improper.").

■ The standard for determining maliciousness must be flexible, and the court must view the defendant's actions in the context of the case presented. *Ideal Dairy,* 282 N.J.Super. at 199, 659 A.2d 904.

### 2. *Introduction*

■ What Dr. Herbert appears to complain of is the Hospital's decision not to consider Dr. Milne's application in light of the contractual relationship between Drs. Milne and Herbert. Even if that were the sole basis for the Hospital's decision not to hire Dr. Milne, no tort liability would lie under the particular circumstances of this case. As will be discussed more fully below, the Hospital acted within its discretion in determining that Drs. Herbert and Milne's contractual relationship was relevant to their staffing decision, assuming for the moment that the existence of the Agreement was the sole basis for the Hospital's decision not to consider Dr. Milne's application. A reasonable hospital administrator could view Drs. Herbert and Milne's contract as a thinly-veiled attempt to barter Dr. Herbert's position on the Hospital. Refusing to consider Dr. Milne's application under those circumstances was well within the Hospital's discretion and in furtherance of the Hospital's fiduciary duty to the public to insure quality health care.

The evidence of record clearly indicates, moreover, that the Hospital's decision was based not on some clandestine effort to thwart Dr. Herbert's bargained-for expectation interest, but rather on numerous other factors, not the least of which were Dr. Herbert's own reluctance to relinquish his position on the Hospital's staff and Dr. Milne's lack of expertise in pediatric anesthesiology. Consideration of these factors also lies well within the Hospital's broad discretion under New Jersey law in implementing staffing decisions.

In tortious interference jargon, no liability lies against the Hospital or its doctors because, in refusing to consider Dr. Milne, they were reasonably exercising a right superior to Dr. Herbert's in choosing who should acquire staff privileges.

Under the circumstances presented by the evidence of record in this case, no reasonable jury could rule otherwise [8]. Accordingly, the

---

8. In his opposition brief and again at oral argument, Dr. Herbert insists that myriad disputed material facts preclude the entry of summary judgment. *See, e.g.,* Plaintiff's Opposition Brief at 1 ("I have never been involved with a case with more disputed material facts."); *id.* at 17 ("The defendants have got to be kidding when they assert that 'there is no genuine issue as to any material fact and they are entitled to judgment as a matter of law.' "). Dr. Herbert's argument relies on an overly broad definition of materiality, for the factual disputes cited in his opposition brief are irrelevant to the legal issues raised by the undisputed facts of this case. Dr. Herbert also argues that summary judgment is inappropriate because malice is an element of a tortious interference claim, and issues of intent and motive are generally for jury determination. As discussed earlier in this Opinion, however, "malice" in the context of a tortious interference claim is a term of art that has nothing to do with the defendant's state of mind. *See Sgro,* 854 F.Supp. at 1183. Dr. Herbert has pointed to no New Jersey authority that the Court should proceed with heightened caution in summarily re-

Court will enter summary judgment in favor of the Defendants and **dismiss** the Complaint **with prejudice.**

### 3. *The Nature of the Agreement*

The Court will, as an initial matter, discuss the nature of the Agreement in order to place the Hospital's decision not to consider Dr. Milne's application in context. As explained below, the Agreement could reasonably be construed as an attempt to transfer non-transferrable hospital privileges. It is with this understanding of the Agreement in mind that the Court will examine whether the Hospital's decision not to consider Dr. Milne's application constituted tortious interference.

The parties do not dispute that hospital privileges cannot be sold. (Plaintiff's Opposition Brief at 18 ("the assertion that it is 'the prerogative of the Hospital—not the departing physician such as Plaintiff—to determine who should hold staff privileges at the Hospital and it [is] the prerogative of the Hospital—not a departing physician such as Plaintiff—to determine which physicians should have access to provide anesthesiology services to the patients at the Hospital' is not disputed")) [9].

■ Despite Dr. Herbert's protestations to the contrary, the Agreement constitutes an attempt to transfer Dr. Herbert's non-transferable staff privileges. By making the transfer of Dr. Herbert's practice assets contingent upon Dr. Milne receiving staff privileges at the very hospital from which Dr. Herbert was departing, Dr. Herbert sold that which he did not own—his Hospital staff privileges.

As an initial matter, a searching inquiry into the record reveals little, if anything, of value to Dr. Herbert's practice aside from his position at the Hospital. Dr. Herbert indicated that he "work[ed] at the Hospital only," that "all anesthesia machines + equip[ment] [were] owned by [the] hospital," that "mostly all" of his patients were new patients, that he did not treat any patients in his own office, that the majority of patients were "randomly given" to him as a result of his position on the Hospital's staff. (Vernoia Aff. Ex. 22 at 1–3).

Since Dr. Herbert's tangible assets had a *de minimis* value, the issue is whether there was a fair market value to the intangible assets purportedly conveyed by the Agreement.

■ Under these circumstances, the Court is at a loss to discern any value to assign to the purported goodwill of Dr. Herbert's practice. Goodwill is defined as the "expectancy of continued patronage." *Newark Morning Ledger Co. v. U.S.*, 507 U.S. 546, 113 S.Ct. 1670, 123 L.Ed.2d 288 (1993). The evidence of record clearly establishes, however, that Dr. Herbert had no customers of his own. Nor is there any evidence that he received any customers from referrals from the Hospital's staff surgeons. (Cosman Dep. 10:12–20); *see Belmar v. Cipolla*, 96 N.J. 199, 209, 475 A.2d 533 (1984) ("To a certain extent, surgeons are sources of business for anesthesiologists, who may compete for referrals."). Rather, the majority of Dr. Herbert's clientele consisted of the patients randomly assigned to him by the anesthesiology staff. (Landauer Dep. 31:15–23 ("They assign the O[perating] R[oom] schedule for the next day for anesthesiologists to work on

solving "malice" issues in the context of a tortious interference claim.

9. Plaintiffs' broker also acknowledges as much. *See* Madeline Pelner Cosman and Thomas Russell Lang, *Selling the Medical Practice: The Physicians' and Surgeons' Guide* (Bard Hall Press) ("While it makes sense for anyone contemplating the purchase of a practice to attempt to obtain such privileges so that the patients accustomed to a particular hospital's care will continue to receive it, the hospital, the university, or the medical school staff administering that institution are under *no obligation* to accept any replacement for a retiring doctor. The purchaser of the practice must apply for hospital privileges, presenting the requisite credentials, affidavits, and recommendations. While the purchase of a distinguished colleague's practice might favorably influence a review board, *there is no automatic acceptance,* and that should not and *cannot be implied....* Hospital privileges are not saleable.") (emphasis added); *see also* Cosman Dep. at 38–39 ("Q: In the case of my cardiologist, for example, if I have medical staff privileges, let's say, at Hackensack Medical Center, practice in the area, can I transfer my medical staff privileges to somebody I want to sell my practice to? A: Certainly not.").

the scheduled surgeries. The OR schedule is made by the nursing staff in three rooms and at 11:00 a.m. the day before the day is scheduled. The anesthesiologist on call will assign those three rooms on a set schedule where the person on call takes the longest room, the person on call the following day or that day, depending if someone is on vacation, takes the short room and the third person takes the middle room.")).

In short, there is no indication that Dr. Herbert had any goodwill to sell. In this respect, the Court finds the reasoning of Defendants' expert persuasive. *See* Valuation of the Anesthesiology Practice of Robert Herbert, M.D., Gorrell Aff. Ex. B ("The value of all of the intangibles and remaining goodwill listed above as part of the sale are predicated upon Dr. Herbert's right to transfer to Dr. Milne a right to practice anesthesiology at the Hospital, a right in which he did not have any contractual ownership. His staff privileges were not purchased from the Hospital, they were granted. Dr. Herbert did not own a right of transference of his position as one of the independent physicians providing services to the Hospital in the rotation. Without the right to guarantee that Dr. Milne would succeed him as an anesthesiologist at the Hospital, all of Dr. Herbert's income and related goodwill would be nonexistent.... Dr. Herbert had no separate valuable location, there was no independent client base and no referral source. It is our understanding that with very limited exceptions, patients were randomly assigned to each anesthesiologist. Therefore, the value which was specified in the contract of $400,000 was for the right to be granted staff privileges at the Hospital and the right to be selected to participate in the rotation of anesthesiologists servicing the Hospital.").

The Court finds the testimony of Dr. Cosman, the broker Dr. Herbert hired to sell his practice, instructive as well:

A: What I said was that the major assets that he would transfer to the practice buyer are his considerable good will, consisting of the right of access to patients in the call schedule at Newton Memorial Hospital, and his covenant not to compete [10]....
And I would say that he is selling his right of access to patients in the call schedule.

Q: ... What right of access did he have to patients in the call schedule? Where was that right defined?

A: The right was defined in part by eight years of his position, or seven and a half years, whatever was the precise number, in which he functioned independently and autonomously in that call schedule.

Q: So you are suggesting that he had an independent right to be on that call schedule simply because he had been on it for eight years and he can transfer that right?

A: Presupposing a person had the requisite talent to take his place, yes.

(Cosman Dep. 161:15—162:4).

Aside from semantics, there is no difference between transferring a position on the Hospital's staff and transferring a "right" to be on a call schedule, for the simple reason that one cannot be on the call schedule to perform anesthesiology at the Hospital unless one is also on the Hospital staff. Neither Dr. Milne nor Dr. Herbert had a right to dictate to the Hospital who should acquire staff privileges. The Court therefore disagrees with Dr. Herbert's broker when she asserts a transferable property right inhering to the benefit of a departing anesthesiologist to be on a Hospital's call schedule. Absent such a transferable right, Dr. Herbert's practice was valueless.

The testimony of the interested parties also indicates that the Agreement contemplated a transfer of Dr. Herbert's staff privileges, as opposed to his saleable assets. Thus, the Agreement itself states that Dr. Milne's first payment to Dr. Herbert is due after Dr. Milne "replace[s] Dr. Herbert in the Newton Memorial Hospital." (Professional Practice Purchase Agreement ¶ 4(A), Vernoia Aff. Ex. 15).

Dr. Milne testified similarly:

to the transfer of Dr. Herbert's non-transferable staff privileges, and not any asset over which he legitimately possessed a right of transfer.

---

10. While there might be an independent value assignable to Dr. Herbert's promise not to practice in the area, the Court finds it significant that the Hospital's alleged acts of interference related

Q: What was your impression as to what you were buying?

A: I felt that I was buying an opportunity.

Q: What was the opportunity?

A: To practice anesthesiology at Newton Memorial Hospital and to earn a certain level of income.

(Dr. Milne Dep. 44:20–25). If Dr. Herbert had a practice of any value independent of his position at the Hospital, the parties need not have conditioned the sale of Dr. Herbert's practice on obtaining staff privileges at Newton Memorial Hospital, as opposed to another hospital in the area. That the parties to the contract viewed Dr. Milne as Dr. Herbert's replacement in the call schedule at the Hospital reveals that the Agreement, in reality, constituted an attempt to sell Dr. Herbert's position at the Hospital.

The Court declines to assume the guise of Paul de Man to deconstruct the Agreement between Drs. Milne and Herbert. By conditioning the sale of assets, worthless in their own right, on obtaining staff privileges on the Hospital, Dr. Herbert tried to sell that which he had no right to sell—namely, his staff privileges. As will be discussed more fully below, the Hospital acted within its discretion if it considered the Agreement relevant in not entertaining Dr. Milne's application for staff privileges.

### 4. Dr. Herbert's Argument that the Hospital was "Open" Staff

Dr. Herbert argues that the Hospital's anesthesiology department ran an "open" staff system. If the Hospital anesthesiology department ran on an open staff, Dr. Herbert's argument goes, the Hospital's only conceivable motivation for failing to consider Dr. Milne's application was its desire to interfere maliciously with the Agreement.

Contrary to Dr. Herbert's assertions, the evidence of record establishes that the Hospital had a "closed" staff anesthesiology department.

Under New Jersey law, a hospital may arrange their anesthesiology department in one of three ways: (1) an "open" staff, whereby any anesthesiologist meeting the hospital's professional qualifications is granted staff privileges; (2) a non-exclusive closed staff, which has a maximum number of available positions and may award staff privileges until reaching the maximum number; and (3) an exclusive contract with a group of affiliated anesthesiologists. *Belmar v. Cipolla*, 96 N.J. 199, 203, 475 A.2d 533 (1984).

Dr. Herbert's contention that the Hospital had an "open" staffing system is belied by his own admissions. Dr. Herbert himself characterized his "practice" as being in a "loose association with 3 others." (Vernoia Aff. Ex. 22 at 1–3). Dr. Herbert's characterization implies staffing limits inconsistent with an "open" staff arrangement.

Furthermore, Dr. Herbert's testimony describing how anesthesiology assignments were made illustrates that the anesthesiology department generally consisted of a limited number of anesthesiologists and further undermines his contention that the Hospital operated on an "open" staff. *See* Dr. Herbert Dep. 35:6–11 ("generally the person that was on call the next day would get the longest room by time, the person that was going to be on call the following day would get the shortest room, and the third person would get the middle room by time.").

Finally, the uncontroverted record in this case establishes that the Hospital took pains to limit the size of its anesthesiology department so as to maintain appropriate skill levels among its staff. (DeLong Dep. 62:9–12 ("The Department feels we can temporize. It would create disharmony to have too large a staff and decrease the ability to keep our skills finely tuned. A decrease in cases per person would decrease the skill level."); Dr. Landauer Dep. 95:10–17 ("The recommendations are that doctors perform a minimum number of cases per year. That was one of the arguments for why you keep a limited number of physicians, ... so that they can maintain their skills."); *see also* Department of Anesthesiology Credentials Committee Meeting Minutes, dated July 20, 1994, Plaintiff's Opposition Brief at E–30 ("Recommendation to Mr. Collette: Until we see how the effects of [Dr. Herbert's] leave of absence affects service, the department feels we can temporize. It would create disharmony to

have too large a staff and decrease the ability to keep our skills finely tuned. A decrease in cases per person would decrease the skill level."); Dr. Landauer Dep. 55:23—56:5 ("... while Dr. Herbert is on leave of absence he is a member of this medical staff and as long as he's a member of the medical staff that makes four anesthesiologists in a department that needs three and a half or so and, if Dr. Milne is on staff, that makes five. And until Dr. Herbert tenders his resignation, instead of just a leave of absence, we couldn't move on another anesthesiologist, given our staffing.")).

In response to this avalanche of evidence indicating that the Hospital has a "closed" staff anesthesiology department, Dr. Herbert states flatly that "it is an undisputed fact that Newton Memorial Hospital is an open staff hospital." (Plaintiff's Opposition Brief at 16). Dr. Herbert's brief fails to cite to the record in this case to support this contention. The Court's independent review of the record, however, reveals two instances mentioning open staffing at the Hospital. See Dr. Villafania Dep. 37 ("Q: Is it an open staff? A: Yes. Q: What does that mean, an open staff? A: If you wish to practice, you can apply."); Memorandum from Dr. Herbert to Ted Einhorn, dated October 3, 1994, Smith Aff. E-112 ("The doctors I spoke to said they believed Newton was an 'open staff' and anybody could apply").

These references in the record to open staffing do not create a triable issue regarding the staffing system of the Hospital's anesthesiology department. Dr. Villafania's testimony, as an initial matter, is ambiguous. It is unclear from Dr. Villafania's testimony whether the doctor refers to the anesthesiology department or the Hospital's other departments by describing "it" as an open staff. Furthermore, Dr. Villafania does not testify that the Hospital was under a duty to consider every application, but rather only that interested physicians were not prohibited from applying. In light of the more specific and uncontradicted descriptions of the manner in which the anesthesiology department operated—descriptions that clearly indicate that the anesthesiology department purposefully limited the size of its staff—the Court

finds that Dr. Villafania's vague testimony is insufficient to create a triable issue with regard to the anesthesiology department's staffing system. See Anderson, 477 U.S. at 251–52, 106 S.Ct. at 2511–12 (summary judgment inquiry is as to "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.").

Dr. Herbert's memorandum describing his conversations with other doctors at the Hospital suffers from the same infirmity. It is unclear from the doctors' quoted statements whether they are referring to the anesthesiology department or some other department of the Hospital when they describe the Hospital's staffing system as "open." See Anderson, 477 U.S. at 249–50, 106 S.Ct. at 2510–11 (when evidence adduced in opposition to summary judgment motion is "not significantly probative" of materially disputed factual issue, summary judgment may be granted). In addition, Dr. Herbert has not offered, and the Court cannot discern, a theory of admissibility for what appear to be the rank hearsay statements attributed to unidentified doctors on the Hospital's staff. 10A Charles A. Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure: Civil 2d § 2738 (evidence adduced at summary judgment stage must be admissible).

Dr. Herbert has failed to adduce sufficient evidence to create a jury issue regarding the Hospital's anesthesiology staffing system. The Court will therefore consider the propriety of the Hospital's decision not to entertain Dr. Milne's application in light of the Hospital's reasonable decision to operate the anesthesiology department as a "closed" staff.

### 5. Superior Rights

The Defendants cannot be held liable in tort because they acted within their broad scope of managerial discretion in declining to entertain Dr. Milne's application. Because the acts complained of were within the Hospital's discretion, the Hospital exercised rights superior to Dr. Herbert's in declining to consider Dr. Milne's application for staff privileges. Accordingly, Dr. Herbert's tor-

tious interference claim must fail as a matter of law.[11]

Hospitals are possessed of "broad discretionary powers in managing their affairs, including the selection of medical staff." *Desai v. St. Barnabas Medical Center*, 103 N.J. 79, 90–91, 510 A.2d 662 (1986). A court will not interfere with a hospital's administrative decision when the hospital acts reasonably for the public good. *Id.* at 91, 510 A.2d 662; *Berman v. Valley Hospital*, 103 N.J. 100, 106, 510 A.2d 673 (1986) ("In determining the validity of a managerial decision made by a hospital, courts understand that the major concern is whether the public interest in health care is reasonably and rationally advanced by the hospital's decision"); *see also Zoneraich v. Overlook Hospital*, 212 N.J.Super. 83, 90, 514 A.2d 53 (App.Div.) ("Judicial review of hospital decisions regarding admission to medical staff, extent of privileges and termination is very limited. Hospital officials are vested with wide managerial discretion, to be used to elevate hospital standards and to better medical care.... So long as hospital decisions concerning medical staff are reasonable, are consistent with the public interest, and further the health care mission of the hospital, the courts will not interfere."), *certif. denied*, 107 N.J. 32, 526 A.2d 126 (1986).

The uncontradicted evidence of record establishes that the Hospital's decision was premised on: (1) the legitimate concern that the anesthesiology department would be overstaffed if Dr. Herbert exercised his option to return during his leave of absence; and (2) the fact that Dr. Milne was not certified in pediatric anesthesiology.

Under New Jersey law, it is firmly established that "a hospital has a right and a duty not only to review the qualifications of doctors, but also to consider the need for and impact of additional doctors on the hospital's staff and patients." *Desai*, 103 N.J. at 88, 510 A.2d 662. Once Dr. Herbert decided to take a leave of absence, no other anesthesiologists' applications for staff privileges were considered by the Hospital. (Gorrell Aff. Ex. T; Collette Dep. 19:3–23, 31–32); (Collette Dep. 13:11–14 ("I said that with him having a leave of absence that there was no need for somebody that he couldn't join the staff with somebody on a leave of absence. Dr. Herbert would have to resign before there would be space available for him.")).

The Hospital was justified in not considering additional anesthesiologists' applications, including Dr. Milne's, in light of Dr. Herbert's leave of absence. *See Belmar v. Cipolla*, 96 N.J. 199, 208, 475 A.2d 533 (1984) ("a hospital has a right and duty not only to review the qualifications of doctors, but also to consider the need for and impact of additional doctors on the hospital's staff and patients"). The Hospital considered the need for hiring an additional anesthesiologist while Dr. Herbert was on a leave and determined that it would impact negatively on the quality of care at the Hospital. (DeLong Dep. 62:9–12 ("The Department feels we can temporize. It would create disharmony to have too large a staff and decrease the ability to keep our skills finely tuned. A decrease in cases per person would decrease the skill level.")).

By declining to consider Dr. Milne in light of potential overstaffing and the concomitant dilution of cases per staff member, the Defendant Doctors and Collette acted within the zone of discretion defined by *Desai*.[12]

Dr. Herbert argues that the restrictive covenant in the Agreement effectively eliminated the Hospital's overstaffing concerns. Dr. Herbert fails to explain, however, how

---

**11.** Because the Court concludes that the Hospital exercised superior rights in declining to consider Dr. Milne's application under the circumstances of this case, it need not address the Hospital and Defendant Doctors' arguments that tort liability cannot lie because: (1) Dr. Herbert had no "reasonable expectation" of economic advantage arising from the Agreement because it was premised on the transfer of Dr. Herbert's staff privileges; and (2) Dr. Herbert had no "protectable right" arising from the Agreement because it was

premised on the transfer of Dr. Herbert's staff privileges.

**12.** It was not until Dr. Herbert officially resigned that the Hospital began considering applications for temporary staff privileges. By that time, Dr. Milne had already secured staff privileges at another hospital. (Milne Dep. 105). Accordingly, the Hospital did not consider Dr. Milne's application at that time.

the Hospital would have standing to enforce the covenant in the event of a breach by either party, or what protection the Hospital could expect if the Agreement were, for any reason, voided. The Hospital was certainly justified in light of these considerations in finding small comfort in the Agreement's restrictive covenant.

Furthermore, the Hospital acted well within its discretion to make staffing decisions when it considered whether Dr. Milne was certified in pediatric anesthesiology. *Desai*, 103 N.J. at 88, 510 A.2d 662 ("a hospital has a right and duty ... to review the qualifications of doctors").

The evidence of record establishes that the Hospital's decision was based on the Hospital's staffing concerns and their desire to comply with the State's pending pediatric anesthesiology regulation. Dr. Herbert has failed to adduce sufficient evidence of record to create a triable issue regarding the Defendants' decision. Accordingly, no tort liability can attach to the Hospital's reasonable, justifiable staffing decision and the Court enters summary judgment on this basis.

Even though entry of summary judgment is warranted for the reasons stated above, the Court nevertheless addresses Dr. Herbert's argument that the Hospital impermissibly considered the existence of the Agreement in deciding not to entertain Dr. Milne's application.

■ Even if the Hospital's sole basis for declining to consider Dr. Milne's application was, as Dr. Herbert contends, the fact that he had a contractual relationship with Dr. Herbert, the Hospital still acted within its discretion and in furtherance of its fiduciary

duties. The worst that might be said of the Hospital and the Defendant Doctors is that they refused to consider Dr. Milne's application because they viewed the Agreement as an attempt to sell non-saleable staff privileges. As discussed above, such a conclusion is certainly not unreasonable. The Hospital acted reasonably in furtherance of the public good by declining to consider Dr. Milne's application even if that decision were based on Drs. Herbert and Milne's Agreement.[13]

The Court finds support for this conclusion in the holding of *Desai v. St. Barnabas Medical Center*, 103 N.J. 79, 510 A.2d 662 (1986). In *Desai*, the New Jersey Supreme Court addressed whether a closed-staff hospital properly may consider whether an applicant for staff privileges has joined the medical practice of a current member of the hospital medical staff. The New Jersey Supreme Court held that the hospital could not. "The hospital staff-admissions policy exception that accords favorable consideration to applicant doctors joining the private practice of doctors already on the hospital staff arbitrarily discriminates against qualified applicants who do not seek or cannot arrange for such associations. This exception has crossed the line of reasonableness and must be invalidated." *Desai*, 103 N.J. at 97, 510 A.2d 662.

Dr. Herbert's lawsuit implicitly seeks to impose a duty on the Hospital to accord his chosen successor favorable consideration by virtue of his ability to purchase a departing physician's practice. Such a duty would not inure to the public benefit, because a doctor's ability to purchase a position correlates imperfectly, if at all, with his competence and

13. The Court's conclusion is based on the particular circumstances of this case, most notably the fact that a reasonable hospital administrator could conclude that the Agreement constituted a sale of hospital privileges. The Court's Opinion does not address the propriety of conditioning an anesthesiologist's sale of his practice on obtaining staff privileges at the departing anesthesiologist's hospital under other circumstances, such as when the hospital has an open staff, or if an anesthesiology group has an exclusive contract with a hospital. Nor does this Opinion address whether, under similar circumstances, a departing physician other than an anesthesiologist properly could sue the Hospital in tort. The

Court's Opinion rests in part on the unique aspects of the practice of anesthesiology. *See Belmar*, 96 N.J. at 209, 475 A.2d 533 ("Although essential to many medical procedures, the practice of anesthesiology differs from other medical and surgical specialties. The record reveals that generally the surgeon or other primary care physician, not the anesthesiologist, admits the patient, who expects that physician or the hospital to arrange for ancillary services such as anesthesia. Patients rarely select an anesthesiologist and in most, if not all, cases, a patient desires anesthesia only in connection with another procedure.").

ability to serve patients. Imposing a duty under these circumstances would be unreasonable because it would cause the Hospital to discriminate against qualified doctors who could not afford to purchase a departing anesthesiologist's position. Under the unique circumstances of this case, the Hospital acted within its discretion in refusing even to consider Dr. Milne's application, even if that decision was based entirely on the existence of the Agreement.

## III. CONCLUSION

Dr. Herbert's apparent belief that he could sell a position of public trust does not deserve the imprimatur of this Court. Because the Hospital and its staff acted within their rights in refusing to hire Dr. Milne (even if that decision was motivated by their distaste regarding conditioning the sale of Dr. Herbert's practice on securing a position on the Hospital's staff), tort liability cannot lie. The Court, accordingly, **dismisses** the Complaint, **with prejudice.**