(*Id.*)

**INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS LOCAL NO. 683 PENSION TRUST, et al., Plaintiffs,**

v.

**ADVANTAGE ENTERPRISES, INC., d/b/a Advantage Electric, Inc., et al., Defendants.**

No. C2–92–588.

United States District Court,
S.D. Ohio, E.D.

Feb. 8, 1993.

James Robert Elleman, Columbus, OH, for plaintiffs.

Jeffrey Steven Creamer, Shumaker, Loop & Kendrick, Toledo, OH, for defendants.

## OPINION AND ORDER

BECKWITH, District Judge.

The plaintiffs in this case are two ERISA multiemployer plans, the Pension Trust and the Annuity Trust (the "Trusts") for the International Brotherhood of Electrical Workers Local No. 683 (the "IBEW Local"). They filed this action against Advantage Enterprises, Inc. d/b/a Advantage Electric, Inc. ("Advantage") and its surety, The Aetna Casualty and Surety Company ("Aetna") under the Labor Management Relations Act, 29 U.S.C. § 185(a) and ERISA, 29 U.S.C. §§ 1132(a)(3), (d)(1), (e)(1) and 1145 to collect delinquent contributions allegedly owed under a collective bargaining agreement, the Inside Construction Agreement. The Trusts also seek interest, liquidated damages, attorneys' fees and costs under the relevant ERISA provisions. Advantage and Aetna have moved for summary judgment on the issue of whether, under the Agreement, any contributions are owed. For the following reasons, the Court will grant summary judgment to the defendants.

### I.

Summary judgment is not a substitute for a trial when facts material to the Court's ultimate resolution of the case are in dispute. It may be rendered only when appropriate evidentiary materials, as described in Fed.R.Civ.P. 56(c), demonstrate the absence of a material factual dispute and the moving party is entitled to judgment as a matter of law. *Poller v. Columbia Broadcasting Systems, Inc.*, 368 U.S. 464, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962). The moving party bears the burden of demonstrating that no material facts are in dispute, and the evidence submitted must be viewed in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). Additionally, the Court must draw all reasonable inferences from that evidence in favor of the nonmoving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962). The nonmoving party does have the burden, however, after completion of sufficient discovery, to submit evidence in support of any material element of a claim or defense on which that party would bear the burden of proof at trial, even if the moving party has not submitted evidence to negate the existence of that material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). It is with these standards in mind that the instant motion must be decided.

### II.

Advantage entered into an Inside Construction Agreement (the "Agreement") with the IBEW Local. The Agreement, effective from June 1, 1989 to May 31,

1992, obligated Advantage to make periodic fringe benefit contributions on behalf of covered employees to the National Electrical Benefit Fund (the "NEBF"), the Local Union Health and Welfare Plan, the Apprenticeship Fund, and the two plaintiff ERISA funds, described in the Agreement as the Local Union Pension Fund and Supplemental Retirement Plan.

In May, 1990, Advantage hired three employees, Stephen Inman, Daniel Tangeman II, and James May. From their dates of hire through May 31, 1991, Advantage made contributions to the NEBF and the Health and Welfare Plan on their behalf, but made no payments for them into the Trusts. When these employees were hired, employee information sheets were completed indicating their classification as "apprentice" or "first year apprentice." At the bottom of one of these sheets, the one pertaining to Mr. May, the following notation appears: "No dues—per Local 683 (Doris). H & W—NEBF—NECA. No Pension or Annuity to Apprenticeship."

Once these employees began to receive earnings, Advantage included their hours on its fringe benefit reports filed with the various plans and the union. On those reports, it consistently indicated their status as "unindentured." For example, the May, 1990 report status on the first page, "256 hours for unindentured not applicable for pension/annuity." Subsequent reports clearly show either that no pension contributions were being made for these three employees, or that their hours were being subtracted because they were unindentured. According to Advantage, it was requested to use the "unindentured" classification by Dan Rankin, whom Advantage identifies as a Local 683 accountant, but who the Trusts state is an actuary for the Trusts.

In May 1991, Inman, Tangeman and May signed union dues authorization cards, becoming union members. Relevant provisions of the Agreement were amended effective June 1, 1991, and beginning that month, Advantage also began making fringe benefits contributions on these employees' behalf to the Trusts.

In July 1992, the Trusts filed suit against Advantage and Aetna, its surety, to collect $10,509.09 in delinquent payments that Advantage allegedly owed for hours worked by the three employees in question between May, 1990 and May, 1991. In its motion for summary judgment, Advantage argues that the three employees were "unindentured first year apprentices" prior to June 1991 and as such, under the Agreement, Advantage had no duty to make fringe benefit contributions on behalf of them to the Trusts. Alternatively, Advantage's position is that, even if the three employees are considered indentured, the Agreement, by an express provision, imposed no obligation on Advantage to make contributions for them to the Trusts.

In rebuttal, the Trusts claim that the Agreement sets forth no category of employee called "unindentured first year apprentices." It is the Trusts' position that the three employees were simply first year apprentices and as such, the Agreement obligated Advantage to make contributions to the Trusts on their behalf. In support of this contention, the Trusts cite other express provisions of the Agreement. As multiemployer plans, the Trusts seek relief from this Court under the relevant provisions of ERISA.

### III.

In their complaint, the Trusts invoke the jurisdiction of this Court under 29 U.S.C. §§ 1145 and 1132. Section 1145 imposes upon an "employer who is obligated to make contributions to a multiemployer plan" a statutory duty, in addition to any contractual obligation, to "make such contributions in accordance with the terms and conditions of such plan or such agreement." 29 U.S.C. § 1145 (1988). In the event that the employer is delinquent in making those contributions, the fiduciary of the plan may bring a civil action under § 1132 to collect the unpaid contributions along with interest, liquidated damages, attorney's fees and the costs associated with bringing that action. 29 U.S.C. § 1132(a), (g)(2) (1988).

### A.

An employer's statutory duty under ERISA to make fringe benefit contributions can only be triggered by a written agreement evidencing that employer's contractual obligation. *Central States Pension Fund v. Behnke, Inc.*, 883 F.2d 454, 459–60 (6th Cir.1989). Therefore, the logical starting point for this Court's analysis is the Agreement entered into by Advantage and IBEW Local No. 683, of which the Trusts are third-party beneficiaries.

The Sixth Circuit has provided guidance for this Court in determining the meaning of a specific provision of a collective bargaining agreement:

> [T]he court should first look to the explicit language of the collective bargaining agreement for clear manifestations of intent.... The intended meaning of even the most explicit language can, of course, only be understood in light of the context which gave rise to its inclusion.... The court should also interpret each provision in question as part of the integrated whole. If possible each provision should be construed consistently with the entire document and the relative positions and purposes of the parties.... As in all contracts, the collective bargaining agreement's terms must be construed so as to render none nugatory and avoid illusory promises.... Where ambiguities exist, the court may look to other words and phrases in the collective bargaining agreement for guidance.... Finally, the court should review the interpretation ultimately derived from its examination of the language, context and other indicia of intent for consistency with federal labor policy.

*UAW v. Yard–Man, Inc.*, 716 F.2d 1476 (6th Cir.1983), *cert. denied*, 465 U.S. 1007, 104 S.Ct. 1002, 79 L.Ed.2d 234 (1984) (citations omitted). This Court, therefore, must look first at the explicit language of the Agreement to attempt to determine what the intent of the parties was in reference to required contributions for first year apprentices Inman, Tangeman and May.

As support for its contention that it had no duty to make fringe benefit contributions on behalf of these three employees prior to June 1991, Advantage cites Section 14.07 of the Agreement, found in Article XIV, entitled "Apprenticeship & Training." Section 14.01 establishes a committee for the selection, education, and training of apprentices, and Section 14.05 provides that "[a]ll apprentices must enter the program through the Committee." Section 14.07 authorizes the Committee to "indenture" new apprentices, but only to the point that the "total number of apprentices in the training area [does] not ... exceed a ratio of one apprentice to three Journeyman Wiremen who are normally employed under the terms of this Agreement." After setting ratios for journeymen, apprentices, and first-year apprentices, Section 14.07 further provides that "[a] first year apprentice, as used above, may be an indentured apprentice in his/her probationary period, or an unindentured person employed from the pool of qualified applicants." The Agreement contemplates that there will be a "pool of applicants" for apprenticeship, and an unindentured person is one who was "interviewed but not selected." The final sentence of Section 14.07 provides:

> The only benefit plans in which first year apprentices and unindentured persons must participate are local health and welfare plan and the National Electrical Benefit Fund (NEBF).

Arguing that the Agreement does obligate Advantage to make contributions to the Trusts, the Trusts rely on the language in Article IX of the Agreement entitled "Local Union Pension Fund," which provides, in pertinent part:

> **Section 9.01.** All Employers subject to this Agreement shall pay monthly to the Local Union No. 683 I.B.E.W. Pension Trust Fund the sum of one dollar and two cents ($1.02) per hour for all hours worked by employees covered under Article III, Section 3.04 of this Agreement except as provided in Section 9.04.
>
> \* \* \* \* \* \*
>
> **Section 9.04.** Pension contributions for apprentices taken after June 1, 1983 shall be according to the following schedule.

1st 1000 hrs.  30% of contribution rate in Section 9.01

.    .    .    .    .

8th 1000 hrs.  75% of contribution rate in Section 9.01

\*    \*    \*    \*    \*    \*

SUPPLEMENTAL RETIREMENT PLAN

**Section 9.05.** Effective June 1, 1986, all Employers subject to this Agreement shall pay monthly to the Local Union No. 683 I.B.E.W. Supplemental Retirement Plan the sum of one dollar and thirty cents ($1.30) per hour for all hours worked by employees covered under Article III, Section 3.04 of this Agreement.

Section 3.04, to which both Sections 9.01 and 9.05 refer, is part of Article III, entitled "Wages–Supervision," and sets forth minimum wage rates for employees, including rates for the first 1000 hours of an apprentice's employment.

It is not disputed that Inman, Tangeman, and May were, at most, first-year apprentices from May, 1990 to May, 1991. Section 14.07 would appear expressly to exclude them from participation in the pension or annuity funds. On the other hand, Article IX *does* appear explicitly to require fringe benefit contributions to the Trusts on behalf of all first year apprentices; otherwise, that portion of Section 9.04 specifying a contribution rate for the first 1000 hours of work would appear to be meaningless, as would the phrase "all hours worked by employees" which is found in Section 9.05. Thus, the explicit language of the Agreement appears to make the section relied upon by Advantage and the sections relied upon by the Trusts irreconcilable.

The second step in the *Yard–Man* analysis requires consideration of "the context which gave rise to [the disputed language's] inclusion." On behalf of the Trusts, M. L. Hoover, business manager for Local No. 683, submitted an affidavit stating that he has always interpreted the language relied upon by Advantage as a "minimum requirement." According to Hoover, the IBEW, which approves all local agreements, required the cited language that is found in Section 14.07. Hoover

states that not all the local unions have pension and supplemental retirement funds. There is nothing in Hoover's affidavit, or elsewhere in the record, relating to the context in which this language was included in the Agreement, nor any explanation why the International Union would wish to impose a minimum requirement not through language to the effect that all first-year apprentices must participate in at least the local health and welfare plan and the NEBF, but by language stating that these are the *"only* benefit plans" such persons must participate in. There is, thus, little assistance provided at the second stage of the analysis.

*Yard–Man* next requires the Court to review the "purpose of the parties" when attempting to interpret a collective bargaining agreement. However, neither side has presented any evidence on the precise issue of why first-year apprentices would either be included in or excluded from participation in the pension and retirement plans. The Court will not speculate on what the parties' respective purposes might have been.

Under *Yard–Man*, this Court, when looking within the four corners of a collective bargaining agreement, must not interpret one provision so as to render another nugatory. If Section 14.07 is found to be controlling, then Advantage's apparent promises in Sections 9.01 and 9.05 to make contributions to the Trusts for all employees, including first year apprentices, would be nugatory. Likewise, if Sections 9.01 and 9.05 are determined to reflect the intent of the parties, the provision of Section 14.07 requiring first year apprentices to participate *only* in the NEBF and the Health and Welfare Fund would be nugatory. When this type of patent ambiguity exists, *Yard–Man* directs the Court to look at other phrases and words in the collective bargaining agreement in an attempt to resolve the ambiguity. Having reviewed the Agreement as a whole, the Court concludes that there is no way to reconcile the contradictory provisions relied upon by Advantage and the Trusts by looking within the four corners of the Agreement itself.

In attempting to interpret an ambiguous collective bargaining agreement, however, the Court is not limited to the four corners of the document. This Court may also look at evidence extrinsic to the Agreement in an attempt to determine the parties' intent in becoming signatories:

> [B]oth parties have offered plausible interpretations of the agreement drawn from the contractual language itself [which] demonstrates that the provision is ambiguous. Neither of the two proffered interpretations is frivolous nor unreasonable on its face, and inquiry should be permitted into extrinsic circumstances.

*Haytcher v. ABS Industries, Inc.*, 889 F.2d 64, 69 n. 1 (6th Cir.1989) (quoting *International Union, UAW Local 91 v. Park-Ohio Industries, Inc.*, 876 F.2d 894 (6th Cir.1989) (No. 88–3145, unpublished *per curiam*)).

The most relevant extrinsic evidence is the April 12, 1991 minutes of the Labor-Management Committee. The Labor-Management Committee is empowered under the Agreement to resolve "grievances or questions in dispute" brought to its attention by authorized representatives of the signatory parties. According to the affidavit of M.L. Hoover, the Labor-Management Committee met on April 12, 1991 because certain employers had not been making payments to the pension or annuity trusts for certain first year apprentices because they were confused about the distinction between "indentured apprentices" and "unindentured persons." Hoover states that the meeting was held to "interpret on whom pension and annuity contributions were to be paid." The minutes themselves state that the "purpose of the meeting was to discuss all fringe benefit employer contributions for all apprentices."

At that meeting according to the minutes:

> [A] unanimous decision was made by the Committee that employer contributions be submitted on all fringe benefits as specified in Article III, Section 3.04 of the Working Agreement on behalf of all apprentices.

> Employer contributions for *unindentured persons* are to be submitted for the Local Union Health and Welfare Fund and the NEBF only. (Emphasis added.)

There is no reference in the minutes that the decision of the Committee was to be retroactive.

Following this meeting, the Agreement was amended, effective June 1, 1991, changing the wording of Section 14.07, and eliminating the reference to first year apprentices:

> The only benefit plans in which *unindentured persons* must participate in are local Health and Welfare plans and the National Electrical Benefit Fund (N.E.B.F.). (Emphasis added.)

The Court concludes that there is only one fair interpretation of the Committee's action on April 12, 1991. The Committee's "unanimous decision" was, in effect, a decision to *amend* the Agreement, not to simply interpret it, thus imposing on all employers the obligation, effective as of the June 1, 1991 amendment, to make "all fringe benefits" available to "all apprentices." Both Section 14.07 of the Agreement as amended, and the Committee minutes referencing that amendment, eliminate the phrase "first year apprentices." Thus according to the minutes, employers are directed to contribute *only* to the Health and Welfare Fund and the NEBF on behalf of *unindentured persons.* Likewise, Section 14.07 as amended states that unindentured persons are only required to participate in the Health and Welfare Plan and the NEBF.

Had the Committee met simply to interpret the already existing Agreement, there would have been no necessity to amend Section 14.07 eliminating the reference to first year apprentices, because that section, in the union's view, was only a "minimum" requirement. Moreover, if the Committee had meant simply to clarify that the employers were obligated from the day they became signatories to the Agreement to make all fringe benefit contributions for all apprentices, it is a fair conclusion that there would have been some reference in

the minutes of the meeting as to the employers' duty to make those payments retroactively. There is no such language in the minutes, which, the Court notes, were drafted by a representative of the union. The minutes of the Committee meeting appear to reflect a joint labor-management decision to impose a *prospective* obligation *only* on the signatory employers as to contributions for first year apprentices.

The Court concludes that the Committee meeting minutes, and the Agreement as amended, are persuasive extrinsic evidence that the intent of the parties when entering into the Agreement was to require that employers make fringe benefit contributions on behalf of first year apprentices only to the NEBF and the Health and Welfare Fund.

This conclusion is reinforced by the fact that Section 14.10, referring to contributions to the Apprentice and Training Trust Fund, was also amended. Originally, it called for contributions on behalf of journeymen and apprentices above the second period—i.e. everyone except unindentured persons and first year apprentices. It was changed to require contributions on behalf of all journeymen and indentured apprentices. This further undercuts the validity of the union's assertion that Section 14.07 contained a "minimum" requirement and the parties always regarded it as such.

The Court also finds persuasive, if not as compelling, extrinsic evidence that the Trusts and the IBEW Local failed to object to Advantage's alleged underpayments on behalf of Inman, Tangeman and May from June 1990 through May 1991. The monthly fringe benefit reports submitted to the Trusts and the IBEW Local clearly show that pension and annuity contributions were not being made on behalf of these three employees. Moreover, many of the monthly reports for that period contain handwritten notations identifying Inman, Tangeman and May as "unindentured." This course of conduct, coupled with the April 12, 1991 Labor Management Committee meeting minutes and the subsequent amendment to the Agreement, convince the Court that reasonable minds could come to

but one conclusion, i.e., that the intent of the parties in entering into the Agreement was to impose no obligation on Advantage to contribute to the Trusts on behalf of employees Inman, Tangeman and May during their first year apprenticeships.

### B.

As stated above, the Court concludes, based on evidence extrinsic to the Agreement, that Advantage did not violate its contractual or statutory obligations by failing to make fringe benefit contributions to the Trusts for the three employees in question. However, even if the evidence is in equipoise, with both parties offering plausible interpretations of an inherently ambiguous contract, the burden is on the Trusts, "as plaintiff[s], to demonstrate that its interpretation is the more reasonable." *Local 546 Health and Welfare Fund v. Lith-O-Kraft Plate Co., Inc.*, 692 F.Supp. 782, 785 (N.D.Ohio 1988).

If both sides have presented equally reasonable interpretations of a collective bargaining agreement, the Court then has evidence that there has been a mutual misunderstanding. The Sixth Circuit has held, in the context of the collective bargaining process, that "where there is a mutual misunderstanding as to a contract term ... the court will rule against the party bearing the burden of proof." *United Steelworkers of America v. North Bend Terminal Co.*, 752 F.2d 256, 261 (6th Cir.1985). The party who alleges that there has been a breach of a collective bargaining agreement bears the "whole burden of proof" on the issue. *Id.*

Therefore, the Trusts, alleging that Advantage breached the Agreement, bear the burden of proof. Assuming that both Advantage and the Trusts have offered reasonable interpretations of the Agreement, the Court would, under *North Bend Terminal*, still award summary judgment for Advantage.

### IV.

For the foregoing reasons, defendants Advantage's and Aetna's motion for summary judgment is GRANTED. The Clerk is directed to enter judgment for defen-

599

dants Advantage and Aetna, and against plaintiffs, the Trusts.