**William HEFFRON, Plaintiff,**

v.

**ADAMAR OF NEW JERSEY, INC., d/b/a Tropicana Casino and Resort, and Hotel Employees and Restaurant Employees International Union, Local 54 AFL–CIO, Defendants.**

Civil Action No. 01–4738 (SSB).

United States District Court, D. New Jersey.

July 15, 2003.

Michelle J. Douglass, Esq., Barker, Douglass & Scott, P.C., Linwood, NJ, for Plaintiff William Heffron.

Shea Hutchins Lukacsko, Esq., Grotta, Glassman & Hoffman, P.A., Roseland, NJ, for Defendant Adamar of New Jersey, Inc.

Regina C. Hertzig, Esq., Cleary & Josem LLP, Northfield, NJ, for Defendant Hotel Employees and Restaurant Employees Union, Local 54.

## OPINION REGARDING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 56

BROTMAN, District Judge.

Plaintiff William Heffron filed this action against his employer, Defendant Adamar of New Jersey, Inc. (d/b/a Tropicana Casino and Resort), and his collective bargaining representative, Defendant Hotel Employees and Restaurant Employees In-

ternational Union, Local 54, AFL–CIO, on October 11, 2001. Count I of Plaintiff's complaint asserts a claim against his employer, under § 301 the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185, for breach of a collective bargaining agreement. Count II asserts a claim against Defendant Local 54 for allegedly breaching its duty of fair representation. Finally, Count III accuses both Defendants of engaging in age discrimination in violation of the New Jersey Law Against Discrimination ("NJLAD"), N.J.S.A. 10:5–1, *et. seq.* Both Defendants now move for summary judgment with respect to all three counts of Plaintiff's complaint. For the reasons set forth below, the Court will grant Defendants' respective motions for summary judgment.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### The Collective Bargaining Agreement

Plaintiff William Heffron ("Plaintiff"), who is currently 78 years old, has been employed as a bartender at the Tropicana Casino and Resort ("Tropicana") in Atlantic City, New Jersey, since June 19, 1982. (Heffron Dep. at 90:16–17). He is also a dues-paying member of the Hotel Employees and Restaurant Employees International Union, Local 54 (hereinafter "Local 54"), the exclusive collective bargaining representative for the Tropicana's bartenders and bar porters. (Defendant Local 54's Rule 56.1 Stmt. at ¶ 1). Local 54 and the Tropicana have been parties to a series of collective bargaining agreements, the most recent of which covers the period from September 15, 1999, through September 14, 2004. (*See* Decl. of Regina C. Hertzig, Esq., at Ex. 1). The provisions of this collective bargaining agreement (here-

inafter abbreviated as "CBA") set forth the basic terms and conditions of employment for all Local 54 union members employed at the Tropicana, including Plaintiff. (Local 54's Rule 56.1 Stmt. at ¶ 2). Article III of the CBA creates certain contractual rights or privileges based on an employee's "seniority" or length of "continuous service" within one of the Tropicana's various departments.[1] For instance, Article III, paragraph 7(a) provides, in pertinent part:

> Seniority shall accumulate from and be calculated by continuous service from the last employment date with the Employer and on the basis of classification seniority within the department as determined by the Employer.
>
> . . . .
>
> Seniority shall govern designation of days off, layoffs/recalls, shifts of work, choice of station or floor assignment if otherwise qualified, and vacation selection subject to Employer's establishment of designated work schedules. Employer may establish a rotation system, the method of which shall be determined jointly by Employer and Union.

(Hertzig Decl., Ex. 1, p. 13). Paragraph 7(c), in turn, sets forth a broad outline of the procedures the Tropicana must follow when selecting employees to fill "available openings" within their respective departments:

> . . . employees with the same departmental classification seniority shall be permitted to bid for the available openings within their respective departments . . . Such openings will be posted for five (5) days. The successful bidder(s) will be determined by seniority . . . For purposes of bidding, bartenders, bar

---

1. Pursuant to Article III, paragraph 8, an employee's "seniority" or "continuous service" within a particular department "shall be deemed broken" under certain circum-

stances (e.g., a discharge for cause, voluntary resignation, extended leave of absence, etc.), none of which are relevant to the underlying facts of this case.

porters, and cocktail servers shall be considered one department and shall be permitted to bid within their respective classification for available openings.

(*Id.* at p. 14–15). Article III, paragraph 11 further states that "an employee absent on leave or vacation" who wishes . . . to exercise bid rights while absent [ ] must designate on a vacation or leave form a proxy stating that another employee or a shop steward may exercise the bid rights for the absent employee. The actions or inaction of [that] designated representative shall be binding on the absent employee and shall not be subject to [the] grievance and arbitration procedure.

(*Id.* at p. 18–19).

*The "re-bid" process*

Representatives from the Tropicana and Local 54 use two different procedures to select bartenders and bar porters for the various job positions and shift assignments available within the casino's Beverage Department. (Amadeo at 14:18–21:13). The first procedure, known as a "bid," is generally used whenever the casino creates a new, "permanent" (i.e., lasting more than 30 days) bartending position. (*Id.* at 14:24–15:24). The position is posted on a bulletin board outside the Beverage Department's offices and all employees in the department are given the opportunity to sign up or "bid" for it. (*Id.* at 14:24–15:7). At the conclusion of the bidding process, the job is awarded to the bidder with the most seniority. (*Id.*; Pl.'s Rule 56.1 Stmt. at ¶ 17; Heffron Dep. at 93:17–24).

The other procedure, known as a "re-bid," is used whenever the casino's changing staffing needs (i.e., the re-opening or closing of restaurant or "outlet") require a reshuffling or re-ordering of the department's shift assignments. (Amadeo Dep. at 17:5–11). When a "re-bid" is required, the casino posts a notice on the bulletin board outside the Beverage Department office directing that all of the department's employees meet in a particular location within the facility at a specific date and time. (*Id.* at 18:15–19:2; Pl.'s Rule 56.1 Stmt. at ¶ 17; Heffron Dep. at 93:17–95:10). This notice is usually posted anywhere from five days to fourteen days before the scheduled "re-bid." (Amadeo Dep. at 18:20–19:20; Heffron Dep. at 111:11–16).

At the "re-bid," which is attended by representatives from both management and the union, a union shop steward or shop chairman reads from a list containing the names of all the employees in the department. (Amadeo Dep. at 26:1–24). The names are read in order of seniority, beginning with the most senior employee in the department. (*Id.*). When an employee's name is called, that employee is given the opportunity to come forward and exercise his "seniority rights" by placing his name on a list containing all of the available job positions and shift assignments within the department. (*Id.*; Hansen Cert. at ¶ 2). In this way, the more "senior" bartenders in the department are given a wider range of shift assignments to choose from than their less senior counterparts.

The list of available shift assignments ordinarily includes a variety of five-day shifts or "bids," four-day bids, and what are referred to as "reserve pool" bids. (*Id.* at 16:24–17:4). "Reserve pool" bartenders are essentially extra bartenders who fill in for other bartenders on an as needed basis, such as when an employee is out sick or on vacation. (*Id.* at 16–7–9). "Reserve pool" bartenders are also occasionally called in to provide additional staff for specific functions like banquets and showrooms. (*Id.*). Some employees actually prefer a position on the "reserve pool list" because it affords them a greater degree of flexibility when arranging their work schedule. As with other positions, those employees who attend a "re-bid" are

given the opportunity to select a spot on the "reserve pool list" in accordance with their seniority. (*Id.* at 16:18–17:4; 41:6–16). Each employee in the reserve pool is then assigned a specific "call-in" time. (*Id.* at 38:6–40:14). Employees at the top of the reserve pool list are assigned earlier "call-in" times—that is, they have the option of calling into the casino further in advance to inquire whether there are any shifts available. (*Id.*). Thus, those at the top of the "reserve pool" list will ordinarily have more shifts to choose from than their counterparts at the bottom of the list. They will also have the first opportunity to choose a shift assignment at one of the more lucrative "outlets" in the casino.

*The March 31st Re-Bid*

For reasons relating to his health, Plaintiff took an approved leave of absence from his bartending position at the Tropicana beginning on February 3, 2001. (Local 54's Rule 56.1 Stmt. at ¶ 16; Pl.'s Response to Local 54's Rule 56.1 Stmt. at ¶ 16). Prior to going on leave, Plaintiff was working as a "reserve pool" bartender and occupied the No. 8 position on the "reserve pool" list. (Pl.'s Rule 56.1 Stmt. at ¶ 1; Cert. of Mark A. Saloman, Esq., Ex. K). He did not submit a proxy form authorizing a shop steward or another employee to place bids on his behalf during his absence. (Heffron Dep. at 96:5–8).

On March 18, 2001, in anticipation of the re-opening of the Tropicana's newly-renovated North Tower, a notice was posted on the bulletin board outside the Beverage Department office announcing that a "re-bid" would take place in the casino's Avanti Restaurant at noon on March 31, 2001. (Saloman Cert. at Ex. P). The notice contained the following admonition: "All bartenders are to report promptly at 12:00 noon. There will be no grace period." (*Id.*). This same notice was also posted in the union hall. (Amadeo Dep. at 18:23–25; 33:5–7).

Plaintiff received permission from his doctors to return to work on March 26, 2001. (Heffron Dep. at 123:19–127:5). However, he did not return to work until sometime in early April. On March 28, Plaintiff called Brian Jones, a Beverage Department supervisor, to ask whether there were any bartending shifts available. (*Id.* at 125:23–126:21). Jones told Plaintiff that the casino had two openings, but Plaintiff turned down both of these assignments. (*Id.* at 126:10–21).

Plaintiff, who had not yet returned to work, did not attend the "re-bid" on March 31, 2001, and therefore did not participate in the selection of shift assignments. As a result, he fell from the No. 8 position in the "reserve pool" to the No. 22 position and was forced to accept a less desirable "call-in" time. (Saloman Cert. at Exs. K and O). Plaintiff's absence from the March 31st re-bid did not affect his ability to exercise his "seniority rights" with regard to layoffs, recalls, or the selection of vacation and days off. (Heffron Dep. at 171:15–23).

In a meeting with C. Robert McDevitt, the president of Local 54, in early April, Plaintiff complained that, as a result of missing the March 31st re-bid, he had been unfairly and improperly deprived of the privileges attendant his seniority status. (Local 54's Rule 56.1 Stmt. at ¶ 21; Heffron Dep. at 296:19–25; 297:1–3). However, McDevitt told Plaintiff that there was nothing the union could do for him because the Tropicana's actions did not constitute a breach of its contractual obligations under the CBA. (McDevitt Dep. at 38:8–39:1). He explained that, by failing to attend the "re-bid," Plaintiff had missed the opportunity to select a position in the "reserve pool" based on his seniority status. (*Id.*). After the meeting, Plaintiff sent a registered letter to McDevitt requesting that the union pursue a formal

grievance against the Tropicana on his behalf. (Heffron Dep. at 252:11–19). When the union failed to act on his grievance, Plaintiff attempted to speak directly with representatives from the Tropicana's management, but was advised that his only recourse was to pursue a formal contractual grievance through his union. (*Id.* at 315:22–25; 316:1–24).

On May 10, 2001, Heffron filed a complaint with the New Jersey Division on Civil Rights (NJDCR) alleging that the Tropicana had unlawfully discriminated against him on the basis of his age in violation of the New Jersey Law Against Discrimination ("NJLAD"), N.J.S.A. 10:5–1, *et. seq.*, by failing to "notify him of the re-bid on March 31, 2001" and allegedly improperly depriving him of his "seniority." (Saloman Decl., Ex. B). On October 11, 2001, shortly after withdrawing his age discrimination complaint from the NJDCR, Plaintiff filed a three count complaint in this Court against both the Tropicana and Local 54. Count I alleges that the Tropicana breached its contractual obligations under the CBA in violation of § 301 of the Labor Management Relations Act, 29 U.S.C. § 185. In Count II, Plaintiff alleges that Local 54 breached its duty of fair representation by "discriminatorily, arbitrarily and/or perfunctorily" failing or refusing to pursue a contractual grievance against the Tropicana for improperly denying him the seniority rights to which he was entitled under the CBA. Finally, Count III accuses both the Tropicana and Local 54 of engaging in age discrimination in violation of the NJLAD. Defendants now move for summary judgment with respect to all three counts of Plaintiff's complaint.

## II. LEGAL STANDARD GOVERNING A MOTION FOR SUMMARY JUDGMENT

■ The standard for granting a motion for summary judgment is a stringent one, though it is not insurmountable. Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment may be granted only when the evidence contained in the record, including "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Serbin v. Bora Corp.* 96 F.3d 66, 69 n. 2 (3d Cir.1996). In deciding whether there are any disputed issues of material fact which must be reserved for trial, the court must view the record in the light most favorable to the non-moving party, together with all reasonable inferences which can be drawn therefrom. The threshold inquiry is whether there are "any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

Once the moving party has carried its burden of establishing the absence of a genuine issue of material fact, "its opponent must do more than simply show that there is some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Indeed, relevant Supreme Court decisions mandate that a summary judgment motion be granted unless the party opposing the motion "provides evidence 'such that a reasonable jury could return a verdict in favor of the nonmoving party.'" *Lawrence v. National Westminster Bank New Jersey,* 98 F.3d 61, 65 (3d Cir.1996) (quoting *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505). In other words, the non-moving party must "make a showing sufficient to establish the existence of [every] element essential to that party's case, and on which that

party will bear the burden of proof at trial." *Serbin*, 96 F.3d at 69 n. 2 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). Thus, if the non-movant's evidence on any essential element of the claims asserted is merely "colorable" or is "not significantly probative," the court must enter summary judgment in favor of the moving party. *Anderson*, 477 U.S. at 249–50, 106 S.Ct. 2505; *see also Quiroga v. Hasbro, Inc.*, 934 F.2d 497, 500 (3d Cir.1991) (observing that non-movant's effort to defeat summary judgment may not "rest upon mere allegations, general denials, or ... vague statements").

## III. DISCUSSION AND ANALYSIS

### A. Plaintiff's "Hybrid" § 301/Fair Representation Action

■ In Counts I and II of his complaint, Plaintiff asserts what is commonly referred to as a "hybrid" § 301/fair representation action against both Local 54, his collective bargaining representative, and his employer, the Tropicana. *See G.P. Reed v. United Transportation Union*, 488 U.S. 319, 328, 109 S.Ct. 621, 102 L.Ed.2d 665 (1989). A "hybrid" § 301/fair representation action is essentially comprised of two distinct, but interdependent, causes of action. First, a union employee "alleges that [his] employer violated § 301 of the [LMRA] by breaching [the terms of a] collective bargaining agreement." *Reed*, 488 U.S. at 328, 109 S.Ct. 621. Second, "the employee claims that [his] union [in turn] breached its duty of fair representation" by discriminatorily or arbitrarily failing or refusing to pursue his ensuing contractual grievance against the employer. *Id.; see also Vaca v. Sipes*, 386 U.S. 171, 177, 194, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967) (discussing the nature and origin of a union's duty of fair representation). In a hybrid § 301/fair representation action, "[w]hether [a union] employee sues both

[his] labor union and [his] employer or only one of those entities, he must prove the same two facts to recover money damages: that the employer's action violated the terms of the collective bargaining agreement and that the union breached its duty of fair representation." *Chauffeurs, Teamsters and Helpers, Local No. 391 v. Terry*, 494 U.S. 558, 564, 110 S.Ct. 1339, 108 L.Ed.2d 519 (1990) (citing *DelCostello v. International Broth. of Teamsters*, 462 U.S. 151, 164–165, 103 S.Ct. 2281, 76 L.Ed.2d 476 (1983) (observing that the two claims which comprise a § 301 action are "inextricably interdependent;" that is, while an "employee may, if he chooses, sue one defendant and not the other; [ ] the case he must prove is the same whether he sues one, the other, or both")); *see also Adcox v. Teledyne, Inc.*, 21 F.3d 1381, 1386 (6th Cir.1994) ("In a hybrid suit under § 301, to recover against either the employer or the union, a plaintiff must show that the employer breached the collective bargaining agreement *and* that the union breached its duty of fair representation.") (citing *White v. Anchor Motor Freight, Inc.*, 899 F.2d 555, 559 (6th Cir.1990) (emphasis in original)); *see also McCoy v. Hess Oil of the Virgin Islands Corp.*, 206 F.Supp.2d 726, 727 (D.Vi.2002) (Moore, J.) (same). Accordingly, "[u]nless [Plaintiff] demonstrates both violations, he cannot succeed against either [Defendant]." *White*, 899 F.2d at 560. For the reasons set forth below, the Court concludes that Plaintiff has failed to demonstrate that the Tropicana breached its contractual obligations under the CBA, and will therefore grant summary judgment with respect to the "hybrid" § 301/fair representation claim asserted in Counts I and II of his complaint. *See, e.g., Adcox*, 21 F.3d at 1386 (affirming district court's grant of summary judgment with respect to plaintiff's hybrid § 301 claim where plaintiff failed to demonstrate that employer's ac-

tions constituted a breach of the collective bargaining agreement); *Marshall v. Local Union No. .6, Brewers and Maltsters and General Labor Departments*, 960 F.2d 1360, 1368 (8th Cir.1992) (affirming district court's "conclusion that without a breach of the collective bargaining agreement by the Company there could be no breach of the duty of fair representation by the Local arising out of the Company's breach.") (citing *Hines v. Anchor Motor Freight, Inc.*, 424 U.S. 554, 570–571, 96 S.Ct. 1048, 47 L.Ed.2d 231 (1976)).

In determining whether the Tropicana's actions constituted a breach of its contractual obligations under the CBA, the Court is guided by the traditional rules of contract interpretation. *See Teamsters Industrial Employees Welfare Fund v. Rolls–Royce Motor Cars, Inc.*, 989 F.2d 132, 135 (1993). The principal goal of contract interpretation is to "ascertain and effectuate the objectively manifested intentions of the contracting parties." *Pacitti v. Macy's*, 193 F.3d 766, 773 (3d Cir.1999) (citing *Hullett v. Towers, Perrin, Forster & Crosby, Inc.*, 38 F.3d 107, 111 (3d Cir. 1994)); *see also Biovail Corporation International v. Aktiengesellschaft*, 49 F.Supp.2d 750, 775 (D.N.J.1999). The first step in ascertaining the "objective intent" of the parties is to determine whether the relevant terms and provisions of the contract are clear or ambiguous. *See Hullett*, 38 F.3d at 111 (citing *Stendardo v. Federal Nat'l Mortgage Ass'n*, 991 F.2d 1089, 1094 (3d Cir.1993)). "A contract is ambiguous if it is capable of more than one reasonable interpretation." *Pacitti*, 193 F.3d at 773 (citing *Mellon Bank, N.A. v. Aetna Business Credit, Inc.*, 619 F.2d 1001, 1011 (3d Cir.1980)); *see also Assisted Living Associates of Moorestown, L.L.C. v. Moorestown, Twp.*, 31 F.Supp.2d 389, 398 (D.N.J. 1998). The existence or absence of ambiguity is itself a "threshold" question of law for the court to decide. *See Teamsters Industrial*, 989 F.2d at 135 n. 2 (citing

*International Union, United Auto., Aerospace and Agric. Implement Workers v. Mack Trucks, Inc.*, 917 F.2d 107, 111 (3d Cir.1990), *cert. denied*, 499 U.S. 921, 111 S.Ct. 1313, 113 L.Ed.2d 246 (1991)).

In deciding whether a particular clause or provision in a contract is ambiguous, the court "assumes the intent of the parties to an instrument is 'embodied in the writing itself, and when the words are clear and unambiguous the intent is to be discovered only from the express language of the agreement.'" *Hullett*, 38 F.3d at 111 (citing *County of Dauphin v. Fidelity & Deposit Co.*, 770 F.Supp. 248, 251 (M.D.Pa.), *aff'd*, 937 F.2d 596 (3d Cir. 1991)). "This does not mean, however, that the court is confined to the four corners of the written document;" rather, the court must read "the contract in the context in which it was made." *Pacitti*, 193 F.3d at 773 (internal quotations and citations omitted). As the Court of Appeals observed in *Mellon Bank*:

> A court must have a reference point to determine if words may reasonably admit of different meanings. Under a "four corners" approach a judge sits in chambers and determines from his point of view whether the written words before him are ambiguous. An alternative approach is for the judge to hear the proffer of the parties and determine if there [are] objective indicia that, from the linguistic reference point of the parties, the terms of the contract are susceptible of differing meanings. We believe the latter to be the correct approach.

619 F.2d at 1011. Thus, under the more flexible and pragmatic approach favored by the Court of Appeals, it may be appropriate to consider extrinsic evidence even when the language of a particular clause or provision in a contract appears on its face to be free from ambiguity. *See American*

*Cyanamid Co. v. Fermenta Animal Health Co.,* 54 F.3d 177, 181 (3d Cir.1995); *see also Teamsters Industrial,* 989 F.2d at 135 (citing Restatement (Second) of Contracts, § 223, cmt. b (1981) ("There is no requirement that an agreement be ambiguous before evidence of a course of dealing can be shown . . .")). "Extrinsic evidence is permitted because the law recognizes that the meaning of words can depend on context, and what may seem unambiguous without context (or in the context that the judge may hypothesize, based on his or her own experience) may be ambiguous when understood from the 'linguistic reference point of the parties.'" *Id.* (citing 3 Arthur L. Corbin, *Corbin on Contracts* § 542 (1960) and 4 Samuel Williston & Walter H.E. Jaeger, *A Treatise on the Laws of Contracts* § 601, at 310–311 (3d ed.1961)). Thus, "[b]efore making a finding concerning the existence or absence of ambiguity, [the court] must consider the contract language, the meanings suggested by counsel, and the extrinsic evidence offered in support of each interpretation" to "determine if there [are] objective indicia that, from the linguistic reference point of the parties, the terms of the contract are susceptible of different meanings." *Teamsters Industrial,* 989 F.2d at 135 (citing *Sheet Metal Workers, Local 19 v. 2300 Group, Inc.,* 949 F.2d 1274, 1284 (3d Cir. 1991) and *Mack Trucks,* 917 F.2d at 111); *see also Pacitti,* 193 F.3d at 773 (citing *Hullett,* 38 F.3d at 111). "Extrinsic evidence may include the structure of the contract, the bargaining history, and the conduct of the parties that reflects their understanding of the contract's meaning." *Id.; Biovail Corp.,* 49 F.Supp.2d at 774.

■ The dispute in this action essentially centers on the interpretation of the following language in paragraph 7(a) of the CBA:

> Seniority shall govern designation of . . . shifts of work . . . subject to Employer's establishment of designated work schedules.

Plaintiff contends that this language is "unambiguous" and automatically entitles him to a position on the "reserve pool" list based on his seniority notwithstanding his failure to participate in the March 31st "re-bid." [2] However, Defendants, as the parties to the CBA, argue that, while this provision may require that the Tropicana give preference to more senior employees when assigning or designating shift assignments within a particular department, it was not intended to excuse union employees from participating, whether personally or through a proxy, in the casino's established "bidding" procedures.

After examining the language and structure of the CBA, together with evidence concerning the "course of dealing" between the Tropicana and the union in the period before and after the CBA took effect in September 1999, the court holds that the question of whether the language of paragraph 7(a) automatically entitles Plaintiff to a position on the "reserve pool" list based on his seniority is, at best, ambiguous. The Court reaches this conclusion for two reasons. First, the general requirement that "seniority . . . govern the designation of shift assignments" must viewed within the context of other, more specific, provisions of the CBA which address the process by which union employ-

---

**2.** In his opposition brief, Plaintiff also argues that the Tropicana breached its contractual obligations under the CBA by failing to personally notify him, whether telephonically or via mail, that a re-bid had been scheduled for March 31st. However, the Court can find no language in the text of the CBA which could possibly be construed as imposing a duty on the Tropicana to personally notify individual employees of an upcoming re-bid. Because there can be no breach of a non-existent contractual duty, Plaintiff's argument necessarily fails as a matter of law.

ees are to select from the various shift assignments available within their respective departments. As explained in the Restatement, the parties to an agreement . . .

> . . . commonly use general language without a clear consciousness of its full scope and without an awareness that an exception should be made. Attention and understanding are likely to be in better focus when language is specific or exact, and in the case of conflict the specific or exact term is more likely to express the meaning of the parties with respect to the situation than the general language. If the specific or exact can be read as an exception or qualification of the general, both are given some effect.

Restatement (Second) of Contracts, § 203, comment e; *see also id.* at § 203(c) (observing that, in interpreting an agreement, "specific terms and exact terms are given greater weight than general language").

Thus, for instance, while paragraph 7(a) states, in rather broad and sweeping language, that "seniority shall govern the designation of . . . shifts of work," paragraph (c) of that same section contemplates a procedure in which employees must first "bid" or express a preference for the shift assignments available within their respective departments. The "[s]uccessful bidders" are then "determined by [the] seniority" of those employees who have participated in the bidding process. Additional language in paragraph 11 of the CBA further highlights the importance of participating in this "bidding" process. Pursuant to the provisions of that paragraph, an employee who anticipates being "absent on leave or vacation" must authorize "another employee or a shop steward" to exercise his "bid rights" during his absence. Taken together, these provisions tend to support Defendants' contention that an employee must take affirmative steps to participate in the bidding process in order to invoke the privileges attendant his seniority status. Indeed, if paragraph

7(a)'s requirement that "seniority . . . govern the designation of . . . shifts of work" were interpreted to grant union employees an unqualified right to select shift assignments based on their seniority, both the bidding procedure contemplated by paragraph 7(c) and the "proxy" mechanism mandated by paragraph 11 would be rendered superfluous. *See* Restatement (Second) of Contracts, § 203(a) (observing that "an interpretation [of an agreement] which gives reasonable . . . and effective meaning to all [of its] terms is preferred to an interpretation which leaves a part unreasonable . . . or of no effect.").

Second, the requirement that the Tropicana designate work shifts based on seniority must also be viewed within the context of the conduct or "course of dealing" between representatives from the union and the casino in the period before and after September 1999, the date the current CBA went into effect. A "course of dealing" is "a sequence of previous conduct between the parties to an agreement which is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions." Restatement (Second) of Contracts, § 223(1). Where such conduct can be reconciled with the express language of a contract, it may serve to "give meaning to," "supplement," or "qualify" the terms of the parties' agreement. *Id.* at § 223(2); *see also id.* at § 202(5) ("Wherever reasonable, the manifestations of intention of the parties to a promise or agreement are interpreted as consistent with any relevant . . . course of dealing . . .").

According to the testimony of shop chairman Billy Amadeo and Beverage Department manager Steven Hansen, representatives from Local 54 and the Tropicana's Beverage Department have been using the "re-bid" procedure to designate shift assignments, including so-

called "reserve pool" positions, since at least 1994. (Amadeo Dep. at 14:18–21:13; Hansen Cert. at ¶¶ 2–4). While the CBA may not make explicit reference to the re-bidding process, the mechanics of the procedure, as they have been described by shop chairman Amadeo, are consistent with the "bidding" provisions set forth in paragraphs 7(a) and 11. Employees are notified of an upcoming re-bid at least five to fourteen days in advance. (Amadeo Dep. at 18:20–19:20; Heffron Dep. at 111:11–16). All employees who wish to select from the various shift assignments available with in the Beverage Department are expected to participate. (Amadeo Dep. at 15:9–12; 19:17–21:13). Those employees who anticipate being out on vacation or some other form of approved leave are required to designate another employee or shop steward as a proxy who can "bid" on their behalf during their absence, as set forth in paragraph 11. (Amadeo Dep. at 19:19–20:8). At the re-bid, each employee (or his proxy) is permitted to "bid" for a specific shift assignment, or alternatively, for a position on the "reserve pool" list, in accordance with his or her seniority or length of service within the department, as required by paragraphs 7(a) and 7(c). (Amadeo Dep. at 15:9–12; 16:24–17:4; 26:20–24). According to both Amadeo and Hansen, if an employee fails to participate in the re-bid process, whether directly or through a proxy, he must accept whichever shift assignments have not already been selected by his fellow co-workers. (Hansen Cert. at ¶ 3; Amadeo Dep. at 20:9–21:8; 26–5–14). Thus, this evidence of the parties past practices or "course of dealing" tends to support their contention that while paragraph 7(a) requires that more senior employees be given preference in the selection of shift assignments, an employee must participate in the re-bid process, whether directly or through a

proxy, in order to exercise the privileges attendant his seniority status.

Evidence concerning the "course of dealing" between the casino and union in the period after September 1999, the date the CBA went into effect, further supports this interpretation of paragraph 7(a). *See Old Colony Trust Co. v. City of Omaha,* 230 U.S. 100, 118, 33 S.Ct. 967, 57 L.Ed. 1410 (1913) ("the practical interpretation of a contract by the parties to it for any considerable period of time before it comes to be the subject of controversy is deemed of great, if not compelling, influence"); *Teamsters Industrial,* 989 F.2d at 137 (observing that evidence relating to the "past dealings of contracting parties pursuant to an agreement" is often highly probative of the intended meaning of their agreement); *see also* Restatement (Second) of Contracts at § 202(4) (observing that "where an agreement involves repeated occasions for performance by either party with knowledge of the nature of the performance and opportunity for objection to it by the other, any course of performance accepted and acquiesced in without objection is given great weight in the interpretation of the agreement."). According to the uncontradicted evidence in the record, the Tropicana and Local 54 continue to use the re-bid procedure to designate shift assignments for the Beverage Department's bartenders and bar porters. Indeed, since the current CBA went into effect in September 1999, union representatives and Beverage Department managers have conducted re-bids on at least six separate occasions. (Amadeo Dep. at 22:17–24:11; 76:5–13; 77–7–24; 78:10–18; Saloman Cert. at Exs. L, M, N, P). Significantly, Plaintiff does not specifically dispute that, without exception, every bartender or bar porter who failed to participate in one of these re-bids (either directly or through a proxy) was required to select from whichever shift assignments had not already

been selected by this fellow co-workers. (Heffron Dep. at 222:12–15; 358:2–25). For instance, when union bartender Howard Scott failed to attend a re-bid scheduled for November 18, 1999, his choice of shift assignments was limited to those positions which remained available at the conclusion of the re-bid. (Amadeo Dep. at 22:17–24:11). When Tom Dwyer, another union bartender, failed to participate in a re-bid held on December 29, 2000, he was forced to accept a position at the bottom of the reserve pool list and a less desirable call-in time. (*Id.* at 76:5–13; Saloman Cert., Ex. K). Union bar porters, Peter Coleman, James Spruill, and Edwin Trujillo, all of whom failed to attend a re-bid held on June 8, 2001, similarly lost the opportunity to exercise the privileges attendant their seniority status and were forced to accept positions at the bottom of the bar porter "reserve pool" list. (*Id.* at 77:7–24).[3] This evidence appears to reflect a common understanding between the union and casino management that paragraph 7(a) of the CBA was not intended to require that the Tropicana honor the shift preferences of those employees who failed to participate in the re-bidding process.

The Court's determination that the terms of the CBA are ambiguous would ordinarily create a question of fact to be resolved by a jury. *See Pacitti,* 193 F.3d at 773 (citing *Hullett,* 38 F.3d at 111); *Teamsters Industrial,* 989 F.2d at 137. However, in this case, the evidence in the summary judgment record is such that no reasonable factfinder could conclude that the Tropicana and Local 54 intended the

requirement that "seniority ... govern the designation of ... shifts of work" to excuse union employees from participating in the re-bidding process. In other words, Plaintiff has failed to produce sufficient evidence to create a genuine issue of material fact with regard to whether his employer's actions constituted a breach of its contractual obligations under the CBA. *See Healy v. New York Life Ins. Co.,* 860 F.2d 1209, 1219 n. 3 (3d Cir.1988), *cert. denied,* 490 U.S. 1098, 109 S.Ct. 2449, 104 L.Ed.2d 1004 (1989) (observing that a factual dispute is genuine only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.").

 Because a motion for summary judgment is designed to go beyond mere allegations, a certain degree of "factual specificity is required of a party opposing such a motion." *Herbert v. Newton Memorial Hospital,* 933 F.Supp. 1222, 1229 (D.N.J.1996) (citing *Celotex Corp.,* 477 U.S. at 322–23, 106 S.Ct. 2548); *Frey v. Pennsylvania Airlines,* 859 F.Supp. 137, 141 (M.D.Pa.1992); *Tozzi v. Union Railroad Company,* 722 F.Supp. 1236, 1239 (W.D.Pa.1989); *see also Quiroga,* 934 F.2d at 500 (observing that, in opposing a motion for summary judgment, the nonmoving party "may not rest upon mere allegations, general denials ... or vague statements ..."); Fed. R.Civ.P. 56(e) (noting that the party opposing summary judgment must "set forth *specific* facts showing that there is a genuine issue for trial") (emphasis added). Accordingly, in order to defeat a properly supported mo-

---

**3.** Employees who arrived late to a re-bid received similar treatment. For instance, when union bartender Bill Auble showed up late to a re-bid on November 3, 2000, he "lost the opportunity to bid on several jobs" which had already been selected by his fellow co-workers. While he was permitted to participate in the bidding process in accordance with his seniority, his choices were limited to those shift assignments which had not already been selected by other employees in his absence. (Amadeo Dep. at 76:14–21). Bar porter Karl Freedman, who arrived late to a re-bid on June 19, 2000, was also required to select from among those shift assignments which had not already been filled by other Beverage Department employees. (*Id.* at 78:10–18).

tion for summary judgment, a plaintiff cannot simply rely on "vague", "self-serving" statements which are "unsupported by specific facts in the record." *Herbert,* 933 F.Supp. at 1229; *Stauffer v. William Penn School District,* 829 F.Supp. 742, 748–49; *Frey,* 859 F.Supp. at 141; *Tozzi,* 722 F.Supp. at 1239. Rather, plaintiff "must point to concrete evidence in the record which supports each essential element" of a claim on which he will bear the burden of proof at trial. *Herbert,* 933 F.Supp. at 1229; *Frey,* 859 F.Supp. at 141; *Tozzi,* 722 F.Supp. at 1239 (in order to survive summary judgment, plaintiff must "identify affirmative evidence of record which supports each essential element of his cause of action."). "If plaintiff fails to provide such evidence, then he is not entitled to a trial and [defendant] is entitled to summary judgment as a matter of law." *Herbert,* 933 F.Supp. at 1229 (citing Fed.R.Civ.P. 56(e)).

 In the instant case, the burden of proving that the Tropicana's actions constituted a breach of its contractual obligations under the CBA rests squarely with the Plaintiff. *See United Steelworkers of America, AFL–CIO–CLC v. North Bend Terminal Co.,* 752 F.2d 256, 261 (6th Cir. 1985) ("the whole burden of proof is on the party alleging breach of a collective bargaining agreement under section 301 of the [LMRA].") (citing *General Warehousemen's Union Local 852 v. Reliance Electric Co.,* 386 F.Supp. 1303, 1307 (S.D.N.Y. 1973)) (noting that "[i]n a suit under § 301(a) of the [LMRA] ... charging breach of a duty created by a collective bargaining agreement, it is plaintiff's burden to prove ... that the defendant breached the collective bargaining agreement."); *see also International Broth. of Elec. Workers Local No. 683 Pension Trust v. Advantage Enterprises, Inc.,* 813 F.Supp. 592, 598 (S.D.Ohio 1993) ("The party who alleges that there has been a breach of a collective bargaining agree-

ment bears the whole burden of proof on the issue."). However, in arguing that the language of paragraph 7(a) necessarily entitles him to select a position on the reserve pool list based on his seniority, Plaintiff relies on little more than his own vague and self-serving testimony. Specifically, Plaintiff has testified that he "thinks" there "might have" been "two or three" occasions in the eight year period between 1991 and 1999 in which he missed a scheduled re-bid, but was nevertheless permitted to retain his position on the reserve pool list. (Heffron Dep. at 97:23–99:25). He has neither identified the re-bids he is referring to, nor pointed to any evidence in the record which tends to substantiate his statements. In light of the language and structure of the CBA, and the evidence which Defendants have proffered with regard to their "course of dealing" in the period before and after the CBA went into effect, the Court concludes that Plaintiff's vague, self-serving testimony is insufficient to raise a genuine issue of material fact with respect to whether the Tropicana breached its contractual obligations under the CBA. Accordingly, the Court will grant summary judgment in favor of Defendants on the hybrid § 301 claim set forth in Counts I and II of Plaintiff's complaint. *See Matsushita,* 475 U.S. at 587, 106 S.Ct. 1348 (observing that "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.' ") (citations omitted); *Anderson,* 477 U.S. at 252, 106 S.Ct. 2505 (noting that, in order to survive summary judgment, the non-movant must show more than "[t]he mere existence of a scintilla of evidence" for claims on which he will bear the burden of proof at trial); *see, e.g., Teamsters Industrial,* 989 F.2d at 137–38 (finding summary judgment appropriate on a claim alleging the breach of a collective bargaining agreement where evi-

dence relating to the "past dealings" of the employer and the union pursuant to the agreement was such that no rational factfinder could accept the plaintiff's proffered interpretation of the CBA's provisions).

### B. Plaintiff's NJLAD Age Discrimination Claim

 Defendants also move for summary judgment with respect to the age discrimination claim set forth in Count III of Plaintiff's complaint. Significantly, Plaintiff's opposition brief is entirely silent with respect to this aspect of Defendants' respective motions for summary judgment and fails to point to any evidence in the record which supports his allegations of age discrimination. Because a motion for summary judgment is designed to go beyond the pleadings, a plaintiff may not successfully oppose a summary judgment by merely resting on the allegations contained in his complaint. *See Lujan v. National Wildlife Federation*, 497 U.S. 871, 888, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990). Rather, he must point to specific evidence in the record which indicates that there remain genuine factual disputes that must be resolved at trial. *Id.* If plaintiff fails to respond in this manner, he is not entitled to trial and the moving party is entitled to summary judgment as a matter of law. *See Herbert*, 933 F.Supp. at 1229 (citing Fed.R.Civ.P. 56(e)).

As far as the Court can glean from the pleadings set forth in his complaint, Plaintiff's age discrimination claim rests on the allegation that while he was precluded from selecting a position on the "reserve pool" list based on this seniority, other "similarly situated younger co-workers" who failed to participate in the "re-bid" process were not similarly "penalized." (Compl. at ¶ 34). Because the summary judgment record before the Court contains no evidence to substantiate this allegation, the Court will grant summary judgment with respect to Count III of Plaintiff's complaint.

### IV. CONCLUSION

For the reasons set forth above, the Court will grant Defendants' motions for summary judgment. The Court will issue an appropriate order.